# BEHZAD A. SAMIMI

36 Emerald Road • Springfield, Massachusetts 01119

Email: samimibdvs@aol.com

Home: (413) 782-0258/ Cell: (413) 237-5295

Date:        February 22, 2005

*05 - 30054 - MAP*

To:          United States District Court,
             Office of the Clerk
             United States Courthouse
             1550 Main Street
             Springfield, MA 01103

Re:          Behzad A. Samimi (Pro-Se Plaintiff)/ Verses

             TYCO Healthcare/ Ludlow/,
             Ludlow Technical Product, Chicopee, MA (Defendants)

Subject:     As a former Manufacturing Supervisor I am filing this Whistleblower
             Nature Grievance Case of Civil Right, Public Policy, Public/ Worker
             Safety and Consumer Protection in an attempt to preserve Workers Civil
             Rights and to make the defendant accountable for their wrongdoings and
             unethical misconducts. I am hopeful that our great judicial system to
             allow me as a "Pro-Se" to assist this court of laws to precede its course
             of actions by going through a "trail by jury" and associated investigation
             processing.

## The Honorable United States District Court:

## 1)- Opening Statement and Introduction:

a)  Your Honor, very respectfully before I proceed, I would like to take this

    opportunity and thank you for your time for the inquiry of this appeal in which

    relates in it's entirely concerning public safety. Additionally I would like to

1

their contaminated medical product the health and safety of their consumers/ patients.

f) During my employment at the "Tyco, Ludlow Technical Products" I had witnessed many workers serious injuries. And, many more that happened before my employment there. As a manufacturing supervisor I was very concerned about preventing additional workers injuries. One of my concern of the fear of the excessive combination of several combustible chemical powders in the department accumulated static charge, and in which formerly in that very same location had resulted in a massive explosion tragedy when a worker attempted to use his non explosive/ non grounded vacuum for housekeeping purposes. This had caused the employee to severely burn 75% of his entire body, including greatly suffering a permanent disfiguration of his face, neck, shoulders and his entire both arms extending to his shoulders. In other instances, other department workers have had back injury. One person's entire arm went through a press machine causing permanent injury disfiguration. Almost every one of these accidental injuries was as a direct result of unsafe work environments created by the management's neglect in not identifying potential hazards. At the defendant's work site orchestrated by the top management, in an attempt to speed up the production at all costs, were deliberately not enforcing safety standards, and overlooking safety procedures and to intentionally allowing workers to practice in unsafe work conditions and

4

unsafely operating their machinery.  They were rather to concentrate on the

bottom line issue ($) rather than making workers safety their top priority.

g) Please notice that my former employer's main product where I worked

(Ludlow Technical Products, LTP) represents very sensitive, sterilized

products:  Medical recording charts, heart monitoring and diagnostic ECG

electrodes/ tabs, heart defibrillation pads/infant monitoring, electro-surgical

grounding pads, wound-care dressings, drug delivery patches, and cosmetic

facial applications. The core of the product is Hydro-gels (60 & 80 Lines,

where I witnessed clouds of hazardous chemical powder release settling down

and leading to the cross contamination on their finished products. Other core

area of their products such as cross contamination to their products at Tabs,

Electrodes, and Heart Defibrillation Pads/ Infant Monitoring at 60's-Line.

Please notice that the final product ensemble is designed to pick up the heart's

electrical signals at the skin's surface. These signals must be intensely and

accurately detected.

h) The above unsafe airborne contaminants were taking place where the entire

production process control discipline according to the FDA-Standards (Food &

Drug Administration) must continuously meet all the applicable quality

standard procedures and are of extreme critical importance. Please notice that

the defendant unsafe work practice neglect were done intentionally in order to

speed up the production rather than allocating appropriate fund to correct the

5

unsafe situations. This cost saving approach is where the parent company "TYCO" for that very same year alone reported <u>36 billion dollars</u> annual sale revenue, an annual profit gain of over 35%. On many occasions management would actually were indirectly in a roundabout way encourage workers, supervisors and top managements with generous bonuses to speed up the production at all costs. Whatever it would take to intentionally ignoring and neglecting to take the corrective safety measurements. Please see attached appendix for details of the safety of violations.

i) Please notice that all my persistent corrective safety recommendation and request were asked from management in totally good faith, to increase workers safety, reduce accidents, reduce down time, increase productivity, efficiency and higher workers moral in which would obviously translate into increase productivity and profitability for the company (please see already submitted original complaint to MCAD & OSHA for my corrective action approaches).

## 3) <u>Background History of the Legal Actions of this Grievance Case:</u>
### (This Grievance Case Was Previously Filed Jointly With <u>OSHA</u> & <u>MCAD</u>)

### A)- <u>Reasons Why MCAD Dismissed This Case:</u>

a) This is a very unique case in which unfortunately the defendant's series of retaliatory safety and disparate incidents and it's unethical nature of events

interconnects with both OSHA & MCAD. Although there were many instance of discrimination, but in my original Joint complaint with MCAD and OSHA I had concentrated on immanent public/ workers health and safety issues. Since, the MCAD has no jurisdiction with doing and assigning their investigators for the investigation of the health and safety complaint issues. That is what I was told verbally by the MCAD Investigating Officers that they had to dismiss my case at the MCAD. Originally when I filed with the MCAD on 8/1/2003 I was told about this conflict of interest and guidelines, the deficiency of the MCAD regulation and the lack of MCAD authority in regards with the health and safety investigation processing. Therefore, since not being able to investigate the incidents. MCAD on the very same day of my complaint filing with them on 8/1/2002 referred me to also file with the OSHA Office. Therefore, on 8/6/2002, by the MCAD recommendation the very same complaint with MCAD was also filed with the OSHA Office.

b) However, MCAD at their final ruling of my dismissal did not mention anything about not having jurisdiction about the health a& safety investigation, and that the reason they had decided to dismiss my case with them. They merely stated at their findings that they are dismissing my case for the "Lack of Probable Cause". This was/is an absolutely false and incorrect/ incomplete statement by MCAD in which needs to be investigated and corrected.

7

## B)- Reasons that OSHA Office Dismissed This Case:

a) OSHA office <u>merely</u> dismissed my case as for the reason of untimely filed (meaning not filed within <u>30-days</u> time limitation of my employment termination). They afforded me the opportunity to file an appeal of their dismissal. I wrote an extensive explanation of why the 30-day time limitation could not be met in my specific situation (please see attached appendix letter to OSHA dated September 4, 2002) . But, then again, in which I did, but then again my case was dismissed for a second time for the very same reason of tolling that 30-days time limitation. Please also see attached appendix letter dated October 17, 2002 under the subject of "a controversial and pressing issues that are affecting negatively and unfairly millions of American workers. A deficient current OSHA enforcement that is discouraging, injurious, and reduces workers productivity and morality".


b) I also need to mention that after OSHA dismissed my case as untimely filed, not only they did not investigate this pressing case of immanent worker/ public safety, but also they did not even do a routine site inspection/ visit to verify any of my detailed pages of safety violation allegations to date.

3)-     My submitted written description of the events, and "Opposition Statements Letters" that has been submitted on this case for the legal actions against the above defendant' are as follow:

| Date | Addressed to: | Nature of Legal Actions Taken | # of Pages |
|------|---------------|-------------------------------|-----------|
| 8/1/2002 | MCAD | Original Complaint | 17 (typed) |
| 8/6/2002 | OSHA | (same above MCAD Letter) | ----- |
| 9/4/2002 | OSHA | Appeal of the Case Dismissal | 14 (typed) |
| 10/19/2002 | Office of United States Senators Kerry, Senator Kennedy US- Dept. of Labor, US- OSHA Chief, US-OSHA Director & MCAD Director | Grievance & experience going through my case in regards with the OSHA laws. Under the Subject: "A very controversial & pressing issues that are affecting negatively and unfairly millions of American workers. A deficient current OSHA missions that is discouraging, injurious, and reduces workers productivity and morality". | 6 (typed) |
| 12/20/2002 | MCAD | Opposition/Rebuttal Letter (respond to Defendant's Rebuttal) | 25 (typed) |
| 12/20/2002 | MCAD | Addendum to the above letter | 3 (hand) |
| 5/16/2003 | MCAD | Appeal of the Case Dismissal | 1 (typed) |
| 9/10/2003 | MCAD | Appeal of the Case Dismissal | 32 (hand) |

## 4)- The Basis of Extended Jurisdiction of this court, to Pursue This Public/ Worker Safety & Consumer Protection Case:

a) Please notice that the basis of jurisdiction and the plaintiff/ defendant can also be as "Federal Question" under 28 U.S.C. 1331. Jurisdiction also arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress.

9

b) Also, please note that this case was also filed with MCAD & OSHA. Consequently, due to the deficiency of the OSHA's, MCAD's and EEO enforcement laws, jurisdiction, conflict of interest, as well as the unfair existence of the technicality and loopholes of the laws this case was dismissed by the above agencies. However, please note that all three MCAD, OSHA and EEOC have given me their "Notice of Suit Rights". According to Equal Pay Act, EPA suits must be filled in federal or state court within $\underline{3}$ years for willful violations of the alleged EPA underpayment.

## 5)- Other Submitted Legal Files and Position Statements for Courts Review:

a) Your honor, please notice that many of previously submitted correspondences to OSHA and MCAD letter contents are additional substantial information supporting of my complaint filing with the Federal Court and that they are relevant to this case that I have against the defendant. I apologize that they are very lengthy, but understanding and following the sequence, pattern and detail of events are extremely important in order to make the court's final decision making on this case.

## 6)- Statement of the Claim:

b) This is a case of violation of worker/ civil rights violation, safety whistleblower/ public interest. Due to financial hardship and not being able to

10

afford a lawyer I have chosen to represent myself for all my legal proceedings not by choice but by having <u>no</u> other options otherwise. Please notice that I am not an attorney, and certainly could very well not have followed all the required technicality of the appeal grievance procedures, and certainly unfamiliar with the entire detailed legal requirement, procedures, research and writing techniques.

c) I believe the court should give broad discretion and benefit of not being an attorney. As a Pro-Se I don't know what codes I should be filing. All I know there are many civil rights violations, worker/ public safety that the defendant had violate. I do realize that as a Pro-Se I may not have clearly followed all applicable rules of proper "Statement of Claim" complaint filings and technical writings. In an unusual scenario cases of raising public safety like this pro-se case, the court should make exception since they know exactly what laws has been violated. The court on this type of public safety case should go through the detail of the events and interpret and indicate specific codes of law that has been violated. Through this grievance filing letter I would like to reserve my rights and file all the necessary motions to allow the Court of Appeal for turning over or assigning violation codes that they believe should be identified or is assigned for its proper "Statement of Claim" designation.

## 7)- <u>Biography, National Origin and Spiritual Convictions:</u>

11

a) I immigrant from the country of "Iran" on 1980. I had been born and raised there as a member of a universal religious belief in which its widespread global peace, principle, harmony of mankind and its practice of human race equality are worldwide highly regarded. However, on the contrary, in my country of origin "Iran", our religious faith is considered prohibited for its practice. Because of our beliefs we had been bluntly persecuted, and deprived from many constitutional rights, banned from educational system, public privilege and have not been treated equally in many aspect of a normal existence. In the history of our faith in Iran, and most recently our members of faith have been facing with countless and various documented religious persecution. Many of my immediate family because of loving humanity have been executed, prison, and currently many are still continue being persecuted. The United Nations, Amnesty International, and other activist organizations report in great details on human right violations by the current fanatic, radical and totalitarian government of Iran against the members of our faith. In search of true liberty, I emigrated from Iran to USA approximately 24-years ago, in which I had been a proud American citizen since 1992.

## 8)- __What has Motivated Me to Pursue This Case So Vigorously:__

a) My genuine conviction/ moral conscious that has been motivating me to vigorously fighting hard beginning of this case from the past 3-years, and as a Pro-Se concern former Manufacturing Supervisor for loving my Country of America very much to confront its injustice. To stand up for myself and make

12

the defendant accountable for their misconducts. The injustice that includes the

worker's right disregard , the public endangerments and unethical conducts that

I had personally witnessed at my former employer workplace, "TYCO, LTP"

workplace.


b) What I would like more than anything is that this great country of America to

remain the greatest country known to any civilization. I am committed, and feel

responsible that other countries of the world to follow our greatest American

Constitution as the highest authentic democratic country known to the

mankind.


c) Your Honor, what is equally most important for me to communicate to the "

Court of Appeal" is that this case that I am now appealing to your attention is

all about ensuring, enforcing great American Constitutional Laws. A case that

is about public security , saving lives, or an injury to a hard working American

workers, to preserving public safety, public interest, and above all workers

reliance in our great judicial system.


d) I m hoping by going through the trial it would make an example of the

consequences if the similar unethical employers who deliberately at all cost

don't follow the rules laws, and the safe work practice and other ethical codes

of conducts. The ones that (like the above defendant) are bluntly were

13

encouraging top executives to take away safety and codes of conducts. They were coached to have one thing in their mind, to increase the production at all costs in order to increase the CEO's & CFO's personal stock market high and in return to get generous bonuses for its reward. As a Manufacture Supervisor I chose to get rewarded by having a clear conscious and to do the right thing to formulate workers safety my top priority.

## 9)- __Why I Have Been Representing Myself in This Case as a "Pro-Se"__

a) The sad reality of this case is that to-date I have been unable to locate an attorney based on contingency fees bases for this case. Numerous attorneys that I have contacted so far have required me before they can accept this case to get reimbursed hourly in advance as the case unfolds. Many have reacted with feeling of intimidation by the name of "TYCO". Others have voiced their analysis of the case as although they believe I have a very good blunt case of retaliatory/ whistle-blowing safety employment discharge case, but they don't have the manpower and resources available to them to pursue such a high profile case up against "TYCO" a 36 billion dollars annual sale of a company. Consequently, they would require some sort of court progress developmental fees in advance from me. Others have even advised me to pursue this case as a Pro-Se, since they are seeing my writing very comprehensive, persuasive and communicative.

14

b) Accordingly, due to financial hardship not being able to afford a lawyer I have chosen to represent myself for all my legal proceedings not by choice but by having <u>no</u> other options otherwise. Please make a note that to-date I had been exclusively representing myself on all of the legal issues.

## 10)- <u>Description, Nature and Extend of the Plaintiff's Injury:</u>

### <u>Countless Pain &Sufferings While Exercising My Constitutional Right</u>

a) Having been motivated for doing the right thing, either during my employment and to-date 3-years after that retaliatory job loss, and also wanting to exercise my constitutional rights has caused me to go through countless series of pains and sufferings.

b) The employer's torments included also the retribution after my job loss, leading to my extended months of unemployment leading to significant financial loss, and direct effect of experiencing severe depression and anxiety.

c) The above employer even after terminating my job knew very well how to continue their retaliation by giving a bad references. They would deceitfully tell any potential job search employers that they are refraining from giving any references since they are in litigation with me. This was a simple retaliation strategy by them in which they would safely and legally continue their retaliation. Doing so, they knew very well that the potential employer would

15

easily with that misleading remark would convey their message loud and clear and the potential employer would easily read the rest of the story. There had been many jobs that I was very close to get hired, but as soon as they would contact my former employer I would loose their interest on hiring me. Their continual dishonorable retribution caused my unemployment of almost 1-year.

d) Representing myself as a Pro-Se in the past 3-years has not been trouble-free, but extreme added emotional anxiety supplemented to my already pain and suffering caused by the continuous retaliatory misconduct of the defendant against me. English being my second language, it had made it even a lot more difficult. In many times I had to find myself changing language in a draft letter without conscious thought. For me following the correct procedural court and legal writing had been very important in order to make it easier for the court to comprehend the sequence of events. Every time I attempted reading my writings I would assume that more procedural and technical improvement is needed. It had been extremely frustrating. I would actually have nightmare at night flash backing to the past and worrying about meeting the court submittal deadlines. Just writing a simple sentence many times seems a big chore for me and sometimes impossible to complete at times.

## 11)- Pain & Suffering Continues,

### How My Retaliatory Job Loss Directly Resulted in My Marital Break-up:

16

a) The defendant retaliatory terminating my job also directly resulted to my marriage break-up of a family of two small children. My wife of another country than mine which is now realizing the facts that she has married to a man that his job has been retaliatory terminated. She knows that his previous unemployment lasted for approximately one full year and she easily can recall the past and all the financial difficulties her family had gone through in the past. And, now only god knows how much longer this time her husband's unemployment status will last. Furthermore, knowing her husband's compassion for humankind, workers health & safety, civil rights and social justice, even if he gets a job probably after another year of unemployment, how much longer will it take again for him to loss his next job over. She has to think about the wellbeing, financial security of herself and foremost her two small children's. Obviously she sees no clear future for her family with this man, which repeatedly being victimized and subjected of repeated job retaliation and retribution. She is also a full time college student, learning English language, and mother of two small children, under these conditions can not be employed. Not having a health insurance makes it extremely difficult for her family. She is from a country that has not fully sympathies with her husband. And now after her husbands job loss, and thereafter,  all she knows most likely her marriage with this man is going to be consisting of a continuous troublesome and a repeated wrongdoing against him along with a constant feeling

17

worrisome of a her future uncertainty and the two children not going to have a normal life. She is now also same as her husband feeling hopeless. And, in a way she is frustrated that he always has to feel obligated and concerned about wellbeing of others and jeopardizing his job by doing the right things. Now she is blaming her husband for her family pain and suffering. Why can't her husband compromise his standards sometimes and do what is the best for his family? Why can't he be like many others, many don't have the experience, advance college education nor does all the associated credentials that he has, but they are a lot more financially successful, and their family much are more happier as the result. She also is aware that especially after the September 11 horrifying tragedy the backlashes against peoples of her husband's national origin (Middle Eastern decent) is getting worse and at its highest.

b) Just writing this appeal letter has been extremely difficult for me, depriving me away from many commodity of family matters, legal issues, financial dealings, continuous current marital difficulties, child visitation and care, job search & upgrading skills, many other hardship that not feeling comfortable to share with you, and in general a major deprivation of a quality of normal life in that matters.

**12)- <u>Pain & Suffering Continues, Experienced Complete Nervous Break-Down:</u>**

18

a) After my retaliatory job loss, while attempting to meet the dead line of 6-months time limitations of MCAD and OSHA on this case on July 28, 2002 caused me to have a complete nervous breakdown requiring me to be taken by the ambulance to the hospital emergency room under intensive care treatment.

## 13)- <u>Pain & Suffering Continues, experiencing a Severe Anxiety/ Depression :</u>

b) After my retaliatory job loss by the  defendant, not being able to find an employment, break up of my family and going through the court grievance procedures was so much that I through my psychiatrist doctor I was referred to a community care mental health crisis center. They facilitated and I participate to an eight-week of anxiety and depression management support group learning the approaches and relaxation techniques in order to help me manage and reduce my major anxiety and depression disorders. This class had been very effective to me by the end of the completion of this training..

c) If it wasn't because of all the below listed active and ongoing continuous treatments and medication application., as well as that extensive 8-weeks anxiety/ depression support group, I would have never been able to meet the deadline for MCAD, and or now this OSHA appeal letter in that manner. Now, I had learned many of learning cognitive behavioral approaches and relaxation techniques to manage my anxiety and depression over time. This intensive support group training was completed on August 7, 2002. However, I am still

19

not ready to go detached on my own, and still required actively under a complete care being treated by Doctor John D. Ferris, Therapist Donald Levy, and Psychologist Ph.D. Laurie H. Weinberg and continuing regularly my anxiety and depression medication. Many professionals have assisted me with my slow recovery process.

d) After my retaliatory job loss and retribution after in which directly affected many pain and suffering, at times I was experiencing a severe anxiety and depression. At times my condition would become so severe that would feel suicidal. Following names were the professional teams members that treated me in an on-going bases and were actively and directly involved with my treatment process.

**14)- Pain & Suffering Associated Medical treatments. Names of Doctors that Treated My Severe Depression & Anxiety Disorder/ Borderline Being Suicidal:**

- M.D. George Kriebel, at Valley Medical Group, treatment for the duration of one month.

20

- Psychotherapist M.S.W., L.I.C.S.W. John A. Laneve, "a Private Practitioner" treatment for the duration of one month.

.- Therapist Mr. Donald Levy, DD/MH, M.A. at "Mount Tom Mental Heath Center" - Psychiatrist M.D. John D. Ferris at "Mount Tom Crisis Mental Heath Center".

- Licensed Psychologist Ms. Laurie H. Weinberg, Ph.D., "a Private Practitioner"



- Psychotherapist M.S.W., L.I.C.S.W. John A. Laneve, "a Private Practitioner" treatment for the duration of one month.

.- Therapist Mr. Donald Levy, DD/MH, M.A. at "Mount Tom Mental Heath Center" -    Psychiatrist M.D. John D. Ferris at "Mount Tom Crisis Mental Heath Center".

- Licensed Psychologist Ms. Laurie H. Weinberg, Ph.D., "a Private Practitioner"

- Therapist Ms. Jennifer Moore, MSW, "Mason Square Community Mental enter (b.h.n.),      Pathway Program, Anxiety/ Depression Support Group Facilitator, and Therapist.

- Therapist, Cerise Washington, Mason Square Community Care Mental Center (b.h.n.),      Pathway Program, Anxiety/ Depression Support Group Co-Facilitator, and Therapist
  Other professional staff in which participated in my consultation therapy sessions in which had greatly assisted me and were actively involved with me on my treatment were also such as:

- Ms. Silvia Wilson, Orientation Case Manager, Community Care Center, Behavioral Health Pathway

- Ms. Zaismely Anderson, Community Care Center Case Manager, Behavioral Health Pathway

- Ms. Ana Martinez, Mason Square Bay State Medical Center, Counselor, Access services

21

**15)-  Pain & Suffering Associated Medical Treatment During Employment.**

**Summary of My Work Related Injuries And Medical Treatments**

**Undertaken During Employment at TYCO For Exposure to Hazardous**

**Chemicals:**

a) Starting the month of September 2000 my symptoms had become more extremely severe, and I had been seen by a few separate doctors on different occasions, while paying for the expenses myself.  I had been told by my physicians allergy specialist that through a series of extensive chemical skin patch reaction testing it is apparent that my symptoms had been exclusively activated by exposure to chemicals at my employer work site.

**16)- Following is just a summary of my medical doctor visits as the direct result of all the above work-related illnesses. This does not include the medical consultation over the phone with the doctors or nurses.**

- My medical treatments started from 9/01/00.

- My medical treatments ended 4/1/02.

- Allergy shots began on 10/26/00 (total of 2- shots, one per each arm).

- Total of **52** different times I had to go and visit the hospital just for allergy shot injections. This had to be done in order to very gradually build up my resistance and immune system against chemical exposures at work.

22

- During my employment I had been under the care of 4 specialists (total of 10 separate-visits).

## 17)- Why the Defendant Doing All They Can in Their Power Not to Allow This Case to Proceed it's Course of Trial Proceedings:

b) The defendant (TYCO, LTP) instead of acknowledging their past cultural misconduct has been doing all they can in their power to intimidate, to influence, to manipulate and to steer clear from going through this case trial proceedings. They rather continue their misconduct, retaliation and retribution against me than to have the courage of the go-forward attitude and to take the blame where it belongs and to be accountable for their past wrongdoings. The obvious reason not wanting to go to a trial against a former Pro-Se Manufacturing Supervisor is that they know very well that they have a lot more to hide and can not afford to get them surfaced. They also know very well that by going through a court trail procedures and all associated further cross examination will surely then is found accountable for. Held responsible for a series of willful public endangerment violations, jeopardizing health & safety of their workers and consumers.

c) The defendant has been taking extreme steps to shield itself from their unethical misconducts, gambling with our safety and security in an attempt to cover up their misconducts. I also believe that our judicial system should encourage and reach out to national security/ safety whistleblowers who risk

23

their career to expose deception and misconducts and should be considered as

true American Patriots.

d) Your Honor, it is imperative that the court read all the attached appendixes. It

is also equally very essential that the Honorable court of U.S. District Court to

read the entire attached appendixes. It is only then, and only by going through

all the attachments that was submitted that the court can fairly perceive a

public safety case reasonably and without a doubt to state their final

conclusion. I apologize that this appeal letter and associated attachments are

very lengthy, but please consider that I have gone through all these writings

and as being a Pro-Se doing my best I can possibly do to assist the court

understanding and following the sequence, pattern and detail of events. These

details provided as an appendix are extremely important in order for the "U.S.

District Court" to take its appropriate correction action on this case and for the

sake of the public civil rights, public safety, and public interest.

e) In order to see the magnitude and persistency of the legal actions that I have

taken so far for the protection of public safety, please see the page-3 of my

attached letter dated September 29, 2004. It will reveal the authenticity of my

pursuing this case and the list of sequences of legal actions that that I as a "Pro-

se" without an attorney and being familiar detailed legal requirement, writing

skills have taken. Please notice that these above legal actions taken to date do

24

not include other possible actions that perhaps I would deem to be taking for public interest and protection of the public safety.

f) From the very beginning of the initiation of this case on 8/1/2002 I have been motivated and energized from being deeply concerned about worker safety and to possibly saving a live or an injury (please see attached letter dated August 1, 2002 to MCAD & August 6, 2002 to OSHA for the detail and sequence of public safety events during and after my employment at the defendant's work place).

g) From what I have been personally experiencing of the defendant's unethical misconducts, and other legal associated proceedings it has made me being extremely concerned about these strings of unjust legal proceedings and each sequence of the unfair legal handling and findings to-date on this case.

h) My concerns of the above health and safety subject matters has caused me to fight with truthfulness, legitimately and heartily in order to identify, evaluate, study and to take corrective actions by making the defendant's accountable for their wrongdoings behaviors. Doing so, I also have raised a controversial and pressing issue that are in addition affecting negatively and unfairly millions of American workers (please see the attached letter dated October 19, 2002 that was addressed to the Senator Kennedy, USDOL-OSHA, and MCAD).

25

i) Please notice that the above pressing case of mine that has been brought up against the defendant and to your attention is not about me it is about doing the "moral/ right thing" and hopefully in that behavior speaking to reach an enhanced worker health and safety protection of the American hard workers. This very same workers that this great country of America owes its very origin existence to the strength and courage of them.

j) Please notice that all along, I have been trying on my own behalf as a concerned former Manufacturing Supervisor and being a proud American Citizen to support achieving this wonderful mission of our greatest constitution known to the mankind. Your Honor, I also do realize that again there are no winners in this case, just to prevail this great American judicial system and to send a clear message so the wrongdoers to stop their unsafe/ unethical misconducts. And, making a statement that American judicial will not tolerate any wrongdoing behaviors. Especially, to those unethical employers who put profit ahead of the public health and safety.

## 18)- Defendant's Admission of Wrongdoing and Improper Act in Writing:

a) On the date of my retaliatory employment termination the defendant attempted to lure and sway me not to exercise my rights. On February 8, 2002 the defendant handed me their attorney's custom made deceitful general release provision letter offering me a payment of 8-Weeks of Severance ($7,567.36) in

26

exchange with forever discharge the defendant from any claim I may bring against them. Please notice although this severance package money, my family and I desperately could have used <u>I refused to compromise my love of the public safety/ worker protection standards</u>. Please also notice that at the time of my retaliatory employment termination, I was the only person who was bringing home any income. This is also when I had a house wife going to school and two small children and at the same time caring for two disable parents.

b) By signing the above agreement the defendant in writing also stated that I was to confirm that I have not filed any claim, charge or action against the defendant and that I will not seek any money or damages from them arising my employment out of employment with them. By signing that agreement I would also affirm that I have no known workplace injuries or occupational diseases. Also by signing that agreement I would agree that I will not apply for or accept future employment at their work place.

c) In an additional attempt to tempt me signing the above fraudulent agreement and waving all my rights they additionally offered me a 3-month of career counseling with "Drake Beam Morin", a nationally known outplacement firm. Then they even continue to stating that by me signing their sneakiness agreement then in exchange they are willing to provide me with their standard

27

reference in response to any inquires from future employers. Please note that since I did not sign their deceitful double dealing agreement they did absolutely opposite of that and from then on they would respond to any potential employer that contacted them saying that since the defendant (former employer) are in litigation with me they refuse to say anything. You we all know that potential employer would read the rest of the story. Believe me that deceptive techniques worked very well and cost me $\underline{1}$-year continuous unemployment. I had sent well over $\underline{200}$ resumes and every time that I would come close to get hired as soon as the employer would the employer would call the defendant I would not hear from them again. This is when I had at that time over 12- years of solid relevant associated experience.

## 19)- <u>Statement of Remedy/ Resolving the Issues:</u>

a) The fact of the matter in this grievance case is that there are no winners in this case that is being argued, and just prevailing justice and fairness. Not being an attorney, certainly I can not put a realistic dollar amount to calculate remedies, back pay loss wages, economic damages, the emotional and physical pain& sufferings and the punitive and compensatory damages in this retaliatory wrongful discharge case. Remedies and damages is to be determined by the jury and the court of law and through its appropriate court procedural evaluation process.

28

**20)- <u>Civil Action Sheet, Nature of Suit, Category that Best Describes This Case:</u>**

b) Please notice that the nature of the suit cannot be determined since there are multiple environmental and civil rights code violations. I am hoping that the deputy clerk or the statistical clerks in the Administrative office to determine the nature of the suit and category codes:

c) For the detail and sequence of the series of the below immanent/ unsafe work practices and unethical disparate discriminatory conducts of the below please see the attached <u>17</u>-pages appendix, jointly dated August <u>1</u>, 2002 to <u>MCAD</u>-Office & August <u>6</u>, 2002 to <u>OSHA</u>-Office.

**21)- <u>Please note that listed below is the category that best this case,</u>**

**<u>"Nature of Suit":</u>**

a) I hereby file this administrative charge of Civil Action on the basis of combining the laws, under the 7-laws (Title VII). I would also like to primary protect my rights by proceeding under all the applicable federal and state laws, as well as other isolated laws, the 1871 Act, and OSHA for Retaliation/ Discrimination Complaint Filing Regulations (Standards-29 CFR) and exercise any other rights afforded by the OSH Act that might likely apply to my situation.

29

Please note that I as a "Pro-Se" not being an attorney have investigated below codes and to my best of knowledge this law suit is arising under a combination of the following, but not limited to:

- The Sarbanes-Oxley Act of 2002
- The Massachusetts Consumer Protection Act, G.l.c. 93A
- The OSHA- Act of 1970, 11 (C), Public Law 91-596
- The Violation of Clean Air Act & Clean Water Act
- The Violation of M.G.L. Chapter 151B, s4 (1)
- The Title VII of the Civil Right Act of 1964
- The Civil Right Act,  Public Policy
- The Civil Rights Statue, 42 USC Section 1981 and 1983
- The Civil Rights Act of 1991
- The Civil Rights Act of 1964, 42 U.S.C.& 2000e et seg
- The Massachusetts Civil Right Act, GLc. 93
- The Massachusetts Civil Right Act, G.L.c. 12 & 11
- The Massachusetts Equal Rights Act, G.L.c. 93
- The National Labor Relations Act, 29 U.S.C. & 151et seg
- Massachusetts Law Against Discrimination G.L.c. 151B
- The Fair Labor Standards Act, 29n U.S.C. &201, et seg
- The Employee Retirement Income Security Act of 1974,29 U.S.C. & 1001 et seg
- The Equal Pay Act of 1963, 29 U.S.C. % 205(d)

30

- The Massachusetts Wage and Hour Laws, G.L. c. 151

- The Massachusetts Privacy Statue, G.L. c. 214, &1B

- The Massachusetts Wage payment Statue, G.L. c. 149, & 148 et seg

- The EPA, POTW, Prohibited Discharge 40 CFR 303.5

- The  NESHAPS, AHERA & Pollution Prevention Act of 1990

- The TRI and EPCRA Act and of 1986

- The RCRA, TSCA, CERCLA, OSHA and HAZCOM, 29 CFR 1910.120

- Any other federal, state, or local human or civil rights, wage-hour, pension or

   labor law, rule and/or regulation, or public policy, any claim under arising

   under common law for malicious prosecution, defamation, libel, slander,

   invasion of Privacy, negligence, interference with advantageous relations,

   infliction of emotional distress, or otherwise.


**22)- <u>Other Discriminatory & Retaliatory Misconduct of Defendants Against Me:</u>**

- Failed to pay equal pay/ wages/ Raises

- Unfair job assignment

- Unfair eavesdropping and spying on me constantly

- Failed to provide on the job accommodation/ office

- Playing favorites on others and against me

- Failed to respond to my grievance in my evaluation

- Failed internal complaint resolutions, corrective actions

- Statistical proof of racial category employment

31

- Denied promotion, transfer and privileges

- Reduced other privileges and reduced internal employment opportunity

- The historical background of the discriminatory practices and other similar situated actions

- Providing false, inaccurate, poor performance evaluations

- Failed to give me references, provided false, bad reference to other internal and external positions applied for

- Planned ahead for elimination of my position

- Not offering me other available qualified job transfer, and jobs that had full qualification, experience and credentials

- Refusing to grant me an interview for internal job opening positions that was qualified for

- Intentionally planning assignments that would be gradually leading to my pretext job classification justification

- Denied pension (401-K) that was to be vested after 3-years.

- Job elimination soon after that I applied for an internal job opening that was fully qualified for

- Subjective performance evaluation rather than objective criteria

- Discouraging me and intimidating me if I follow grievance procedures to the headquarter TYCO

- Defamation of characters to other potential employers after retaliatory termination of my employment, causing 1-year of unemployment.

32

- Not practicing the company rules and codes of conducts.

- Attempted to persuade other dept. managers to not making a job transfer/ promotion to me.

- Offering no lesser alternative position to my request rather than eliminating my position

- Retroactively down graded my performance appraisal

- Placed derogatory comments in my personnel files and for other mangers to see

- Intentionally adding a pre-conditions for requested assignments & internal job openings to refrain me from being considered qualified.

- Denied me filing workmans comp, and to get medical reimburment for my occupational injuries

- Being the only supervisor not having a locked office, personnal computer and other supervisory privileges as others

- Failed to comply with any safety standards that effected my health, and intentionally causing my ill health effect to worsen, so I would leave my employment voluntarily

- Failed to provide internal training to me only, and or anything that would cause to upgrade my skills

- Intentionally did not take any steps to fairly investigate the circumstances involved in the alleged harassment and offenses as I stated in my performance self evaluation.

33

- Not carrying a consistent policy and procedures for disciplining, firing and job elimination

- Racial name calling, such as Bin Laden, Saddam, Camel Jockey, Ayatollah, terrorist

- Many other disparate treatments that is not listed

**23)- Detailed of all other Facts of the Case & Detail and Sequence of the series of Defendants Unlawful Misconducts:**

a) For all the above detail and sequence of the series of immanent/ unsafe work practices and unethical disparate discriminatory conducts please see the below attached 17-pages appendix, jointly dated August 1, 2002 to MCAD-Office & August 6, 2002 to OSHA-Office.

**24)- Closing Statement, Conclusion:**

A. Your Honor, very respectfully yours, I would be more than glad to assist any investigating agencies with this case in any manners the court deem necessary. I would be equally very much appreciated and pleased to assist the "Honorable U.S. District Court" if you require any additional information that I have unknowingly not furnished in this Whistleblower/ Public Safety Appeal Motion. If the Court feels that this case fails any technicality and procedural statement to please specify and require me to

provide them to your majesty. With full apology to the Court of my lack of legal term language and research knowledge.

B.  Please allow me a chance to provide you with any insufficiency of technical procedural materials that I may have not provided in my appeal. Please put under consideration that I am not an experienced attorney. I am just an ordinary concern "Pro-Se" former Manufacturing Supervisor who could not afford to hire an attorney to represent me. I am aware that I could very well not have followed all the required technicality of the appeal grievance procedures, and certainly unfamiliar with all the detailed legal requirement, procedures, research and writing techniques. But, I am still more than glad to assist the court of laws in any way I be capable of.

C.  Please notice that what makes this Pro-Se case slightly different than others is that this is a case of whistleblower nature for the sake of improving the existed deficiencies and injustice and above all worker/ public safety and public interest in order to save a live or even a small injury that is unnecessary and can be made preventable.

D.  My life and my family life has been miserable and been on hold for the past 3-years to pursue this Whistleblower Nature Grievance Case of Civil Right,

35

Public Policy, Public/ Worker Safety and Consumer Protection to its justice. We have been through a lot of horrendous experience during my employment, after the defendant retaliatory eliminated my job and then years of the retributions after to-date.

- The Honorable President "George W. Bush" in Martin Luther King remembrance on January 17, 2005 stated that "Martin Luther King loved this country so much to confront its injustice".

- Also, John J. Sweeney, President of American Federation of Labor and Congress of Industrial Organization States that "Workers who stand up for their co-workers and public good against lawbreaking employers are among the unsung hero's of our society, it is my believe that when the whistle is blown, the wrongdoer and not the whistle blower gets punished".

Very Respectfully,

Behzad A. Samimi

*Attachments Enclosed,*

- *Letter dated August-1 & August 6, 2002 to MCAD & OSHA*
- *Letter dated September 4, 2002 to OSHA*
- *Letter dated October 19, 2002 to Senators Kerry & Kennedy*
- *Severance Package Summary & Proposed Agreement (Did not Sign)*
- *MCAD & OSHA Dismissal letters*

36

BEHZAD A. SAMIMI
36 Emerald Road • Springfield, Massachusetts 01119
Email: samimibdvs@aol.com / Home: (413) 782-0258

Date:       October 19, 2002

To:         Office of the Senator John Kerry
            One Bowdoin Square, 10th Floor
            Boston, MA 02203

Subject:    A controversial and pressing issue that is negatively and unfairly
            affecting millions of American workers;
            a deficient OSHA enforcement that is discouraging, injurious, and reduces
            workers productivity and morality.

Re:         OSHA Doc. Number: Tyco Healthcare/samimi1-1270-02-014
            MCAD Doc. Number: 02SEM02643
            EEOC Doc. Number: 16CA202866


**The Honorable John Kerry, United States Senate:**

Very respectfully yours, I and many other workers have been greatly supportive
of your fundamental mission and principles.  We are all well observant that
you and your devoted professional staff are constantly striving to improve the
laws that rule us, to better the quality of life, and to ensure safe and
healthy work conditions for all working men and women.  This is one of the
main reasons that have motivated me to write this letter to you on behalf of
many other appreciative workers.

Dear Senator Kerry, your exceptional efforts are proof of your past
accomplishments and endeavors to improve the quality of life equally for all.
We sincerely appreciate your continuous service to this great nation, today
and tomorrow.  Once again, we are assured you will not let American hard-
working men and women down.

I am sending you a copy of the attached letter, that I think might be of
interest to you. If you would like any additional information not supplied to
your office, or if I can be of any assistant to your cause, please do not
hesitate to contact me.

                        Very cordially yours,

                        Behzad A. Samimi

Mr. John Spear, USDOL-OSHA Chief, Washington, D.C.
Mr. Richard Fairfax, USDOL-OSHA Director, Washington, D.C.
Mr. Frank Gravitt, USDOL-OSHA Regional Administrator, Boston, MA
Mr. Ronald Morin, USDOL-OSHA Area Director, Springfield, MA
Ms. Carole Horowitz, USDOL-OSHA, Investigator, Springfield, MA
Ms. Migdalia Rivera, Massachusetts Commission Against Discrimination
   MCAD, Investigator, Springfield, MA

1

BEHZAD A. SAMIMI
36 Emerald Road • Springfield, Massachusetts 01119
Email: samimibdvs@aol.com
Home: (413) 782-0258

Date:      October 19, 2002

To:        Ms. Migdalia Rivera, Investigator
           Massachusetts Commission Against Discrimination
           436 Dwight Street, Room 220
           Springfield, MA 01103

Subject:   A controversial and pressing issue that is negatively and
           unfairly affecting millions of American workers;
           a deficient OSHA enforcement that is discouraging,
           injurious, and reduces workers productivity and morality.

Re:        OSHA Doc. Number: Tyco Healthcare/samimi1-1270-02-014
           MCAD Doc. Number: 02SEM02643
           EEOC Doc. Number: 16CA202866

Dear Ms. Rivera:

I am sending you a copy of the attached letter, that I think might be
of interest to you.

If you would like any additional information not supplied to your
office, or if I can be of any assistant to your cause, please do not
hesitate to contact me.

                          Very respectfully yours,

                          Behzad A. Samimi

CC:   The Honorable John Kerry United States Senate
      Mr. John Spear, USDOL-OSHA Chief, Washington, D.C.
      Mr. Richard Fairfax, USDOL-OSHA Director, Washington, D.C.
      Mr. Frank Gravitt, USDOL-OSHA Regional Administrator, Boston, MA
      Mr. Ronald Morin, USDOL-OSHA Area Director, Springfield, MA
      Ms. Carole Horowitz, USDOL-OSHA, Investigator, Springfield, MA
      Ms. Migdalia Rivera, Massachusetts Commission Against Discrimination
          MCAD, Investigator, Springfield, MA

1

# Behzad A. Samimi

36 Emerald Road • Springfield, Massachusetts 01119
Email: samimibdvs@aol.com / Home: (413) 782-0258

Date:      October 19, 2002

To:        Office of the Senator Edward M. Kennedy
           Attention: Mr. Kiyoshi M. Yu
           2400 John F. Kennedy Federal Building
           Government Center
           Boston, MA 02203

Subject:   A controversial and pressing issue that is negatively and
           unfairly affecting millions of American workers;
           a deficient OSHA enforcement that is discouraging, injurious,
           and reduces workers productivity and morality.

Re:        OSHA Doc. Number: Tyco Healthcare/samimi1-1270-02-014
           MCAD Doc. Number: 02SEM02643
           EEOC Doc. Number: 16CA202866

## The Honorable Edward M. Kennedy United States Senate:

Very respectfully yours, I and many other workers have been greatly
supportive of your fundamental mission and principles. We are all well
observant that you and your devoted professional staff are constantly
striving to improve the laws that rule us, to better the quality of life,
and to ensure safe and healthy work conditions for all working men and
women. This is one of the main reasons that have motivated me to write
this letter to you on behalf of many other appreciative workers.

Before I proceed, I must acknowledge the fact, that it is admirable what
OSHA staff has accomplished to-date given the very limited numbers of
inspectors and current very low annual budget. OSHA staff is doing its
very best it possibly can, considering the tremendous tasks involved in
monitoring work conditions and workers protection.

You may recall that approximately two-years ago, I had contacted your
office regarding a different public matter. My extensive research and
inquiry assisted the federal and the state authorities to advance their
principle purpose. It guided them in ensuring public welfare and
protection by taking appropriate preventive and corrective actions. That
same concern of mine still remains, after two years, a very pressing issue
in the legal & constitutional investigation proceedings.

I am now once again deeply concerned, although my concern is in regards to
another subject matter. I am writing this letter on behalf of thousands
of hard-working individuals who have lost their jobs because they chose to

Behzad A. Samimi

---

do the right thing at work. I am also included among them. The reality of my specific situation and the emotional condition I was in is very comparable to that of millions of other American hard-working men and women.

I am an immigrant who was part of a minority religion in my homeland of "Iran", and was faced with extreme religious persecution. Many members of my immediate family have been executed, imprisoned, and many others continue to be persecuted. The United Nations, Amnesty International, and other activist organizations report in great detail on the human rights violations made by the Islamic government of Iran against my Faith. In search of freedom, I emigrated from Iran to USA approximately 20-years ago. I am now an American citizen who loves my country, USA, very much, and I would like this country to remain the greatest country in the world. I am committed, and feel responsible that other countries follow our greatest American constitution as the highest authentic democratic country known to mankind.

Meanwhile, all along I have been feeling differently at work. "Every time I passed through those plant gates to go to work, I left America and my rights as a free man. I spent nine hours in there, in prison, and then came out into being free again". These words (by an author I can't recall) capture this feeling that I have been experiencing, and many other American workers feel a common sentiment as well. I consider you a great Senator with a strong conviction for, and who has the power, competency and the courage to, make a change for the betterment of American hard-working men and women. The great working people deserve and need your assistance.

Approximately 8-months ago my employment as a Manufacturing/Production Supervisor was terminated on February 8, 2002. My former employer, "TYCO", retaliated against me for numerous health and safety recommendations that I had made to the management during my employment. They terminated my position unjustly as the result of truths I had, in good faith, uncovered and for the health and safety conditions I asked for my coworkers and myself. The employer intentionally ignored my safety concerns, and planned and executed their unethical and unsafe work practices by showing repeated retaliations toward me, leading ultimately to my job termination. Please notice that I was the only one in the history of the company of 900-workers that has been considered laid-off from the manufacturing and production department to date.

I filed a complaint with both the Massachusetts Commission Against Discrimination (MCAD) office on August 1, 2002, and Occupational Safety and Health Administration (OSHA) office on August 6, 2002. Both complaints were filed within 6-months of my termination. MCAD has assigned to investigate my case against "TYCO" and the investigation currently continues. However, OSHA has dismissed my case as untimely filed (meaning not filed within the 30-day time limit). OSHA has afforded me the opportunity to file an appeal of that dismissal within 15-days. Please note that I requested an OSHA appeal action with my reasoning for a

waiver on September 4, 2002. Presently, I am waiting for a response from the USDOL-OSHA office in regards with their final appeal review decision.

Dear Senator Kennedy, I have given you a very brief narrative of the above factual evidence. For additional detailed information please read the attached complaint that was filed with the office of OSHA and the MCAD office. My case is a common example of many others similarly situated. It should be classified as a case study to display the unethical and unsafe work practices that many corporations conduct. These corporate wrongdoers are crudely and negatively affecting our economy and millions of American workers. I believe workers are more productive in a safer workplace. They are more efficient as a result of reduced job injuries and by eliminating workplace causes of disease. By taking safety measurements, employees can actually feel part of a caring team work atmosphere. This will indeed lead to increase in productivity, to increase in efficiencies, to reduce in waste and error, as well as to lower in the cost of workers' compensation coverage.

Dear Senator Kennedy, please notice that major improvements and reforms are needed in OSHA rulings and safety standards to protect lives and to preserve the health and safety of millions of American workers. The longer this reform takes, the more workers will be subjected to unsafe conditions and will possibly lose their lives. The following recommendations address many of OSHA's deficiencies. Might I, with great humility and deep concern, propose to the Senator the following high-priority & very pressing health and safety issues that have negatively affected millions of other workers and me:

1)- It is time to expand the tight window of OSHA complaint filing from a mere 30-days time limitation to a minimum of 6-months. This is to be done so workers can reasonably, and without the fear of immediate retaliation, exercise their rights against the illegal and unsafe practices of employers. Increasing the OSHA complaint time limit from 30-days to 6-months or higher, will increase productivity, expand safety standards, advance workers morality, and most of all will save lives and prevent injuries. This 30-day Time limit had been from the inception very misleading to many workers. Especially, many non-union workers don't know of this filing time-frame. And, almost always and intentionally the employer does not inform workers of this tight window limitation rights. Unfortunately many uninformed workers are not aware that exercising their rights under OSHA is usually what has encouraged the personnel action of retaliation. They will not know that much later after they have lost their job and their rights to file for a complaint. At the time when our country is witnessing corporate unethical work standards, there should be at least 6-months time limit by OSHA regulators. This should be done especially in regards with corporate abusers such as Enron, WorldCom, and my former employer "TYCO". It is time again for legislators to stand up for the consumers and worker protection

Behzad A. Samimi

rights and eliminate loopholes that only benefit corporations.

2)- It is time to strengthen and protect outspoken and daring workers ("whistleblowers"), that choose to exercise their rights under safety workplace standards.  There are very limited laws that protect people who, in good faith, make their voices heard, or worse have lost their job. Many times even after the employee has already lost his job, this same employer continues retaliation including providing bad references to the potential future employers. The fear of employer retaliation and reprisal is especially great in workers that are not union members.  If workers do not have a firm OSHA assurance of protection, they will not pursue and take initiatives regarding safety measurements, or engage in preventive & corrective actions. As the result of the fear of employer retaliation, the work sites in most necessity of OSHA's watchfulness are unknowingly cast out by the OSHA enforcement authorities.

3)- It is time to strengthen OSHA's weak legal and judicial authority, as well as inadequate and under-enforced workplace safety regulations.  It is time to increase the criminal penalties for falsification and manipulation of safety records.  Many times the role of the courts greatly lessens the power of OSHA's enforcement, to the disadvantage of workers' rights.  We can't legislate corporate greed, but OSHA laws should do whatever they can so that greed does not succeed.  We need to show corporations they can't save money by ignoring full safety precautions.  Those employers that observe unethical and unsafe work practices must be forced by OSHA to come to the realization that failing to take safety corrective and preventive actions is not an employer option.

4)- It is time to strengthen weak OSHA citations and criminal penalties for willful violations.  An astonishing average OSHA civil fine for a willful violation is approximately $3,000.00 per inspection.  An increase in citation fines and criminal penalties will discourage employers who are inspired by the bottom-line - money.  Many employers are only positioning for profits, ignoring health & safety to speed up production.  Increasing OSHA citation fines and criminal penalties will warn them to think more carefully when the employers choose to deliberately neglect unsafe practices and conditions.  The only solution to this dilemma is for employers to recognize that the cost of breaking the law is indeed much higher than the cost of preventing unsafe work practices.

5)- It is time to increase OSHA inspection numbers and at the same time increase inspection efficiency.  The inspection should also be more proactive and preventive, and focused on training rather than punishing.  You cannot expect and rely on employers and unethical corporations to police themselves.  The employers cannot be the sole moral authorities when many in actuality are the cause of this immoral misconduct.  With the current number of available OSHA staffing in comparison with the workplaces and the employees, the

ratio translation is that we roughly have one OSHA inspector for 100,000 employees, or 6,000 workplaces. This astonishing ratio speaks for itself. OSHA understaffing and shortage of OSHA inspectors is the most injurious and damaging to OSHA's current predicament.

6) - It is time to increase OSHA funding. Many of OSHA's deficiencies and weaknesses are directly the result of congressional under-funding. To sufficiently monitor workplace safety, OSHA would need an enforcement budget much greater than the current OSHA funding allocation. Currently with the federally allocated OSHA funding, the budgeting ratio translates roughly to $4.00 per worker per year. More OSHA funding is needed also because currently there is no time limit on OSHA investigation of discrimination complaints. What that means is that due to the low funding and shortages of inspectors, it can take any amount of time for the complaint investigation. While the worker is waiting for OSHA findings, the same employer can continue retaliation. In summary, more OSHA funding is required for more inspectors, for enhanced appropriate enforcement, for expanded investigation, for extended safety standards, for higher safety work integrity, and finally for the ease of work piled up by overworked OSHA personnel.

7) - It is time to require that the employers record workers' chronic illnesses in their reported OSHA logs after the exposure to the ill-health causing sources. Many workplace illnesses and diseases do not become visibly evident until long after the exposure, in many cases after the employee has changed employment. These long-term unknown illnesses are rarely recorded by the employer on their OSHA logbook. Unfortunately, unethical employers many times keep two sets of logs: one for OSHA, and one for their insurance records. OSHA enforcement needs to require employers to keep one OSHA log for both purposes.

8) - It is time that more rights are given to employers than corporations, since U.S. Constitution does not specify corporations. Corporations should be created by people, for the people. It is time legislators begin challenging the roots of the concept of corporate privilege and rulings. In many cases, particularly non-union workers have come to accept that at work they are not entitled to the rights and privileges we normally enjoy as citizens. In general, non-union workers have also come to accept that at work they are automatically guilty unless proven otherwise. They have no other choice but to embrace employer retaliations, which include reduced privileges and job termination.

9) - It is time to allow OSHA inspectors to search and identify a reasonable eminent danger to workers without having to get a search warrant. The promotion of general worker protection, rather than the privilege of unethical corporations, needs to be the primary focus. The tragic reality is that, almost always while OSHA inspectors are

struggling to get a warrant for a reasonable investigation, the employer harboring unsafe work conditions can conceal the evidence, sabotage the documentation and elude OSHA inspectors of finding safety violations.

10)- It is time that, provided OSHA has reached the final conclusion that an employee has a meritorious claim of unlawful retaliation, employees should be granted the right to independently pursue actions against the employer in a judiciary courting system. OSHA investigations leading to a finding of willful retaliation without granting the appropriate remedy should be considered a senseless authoritative conclusion.

Dear Senator Kennedy, as you are well familiar, in order to rebuild the confidence of people we must find and expose unethical and corrupt corporations. Corporate corruption goes beyond just bad accounting practices, to unethical safety conducts. It involves corporations intentionally ignoring eminent safety issues and jeopardizing the health and safety of workers for their own greed. Many white-collar corporate criminals have taken away our money, our jobs, shattered our families, and taken away workers' safety and health. But, it is time for us to stop them from taking our dream. The dream of justice and fairness at work.

Dear Senator Kennedy, your exceptional efforts are proof of your past accomplishments and endeavors to improve the quality of life equally for all. We sincerely appreciate your continuous service to this great nation, today and tomorrow. Once again, we are assured you will not let American hard-working men and women down.

If you would like any additional information not supplied to your office, or if I can be of any assistant to your cause, please do not hesitate to contact me.

Very cordially yours,

Behzad A. Samimi

CC:  The Honorable John Kerry United States Senate
     Mr. John Spear, USDOL-OSHA Chief, Washington, D.C.
     Mr. Richard Fairfax, USDOL-OSHA Director, Washington, D.C.
     Mr. Frank Gravitt, USDOL-OSHA Regional Administrator, Boston, MA
     Mr. Ronald Morin, USDOL-OSHA Area Director, Springfield, MA
     Ms. Carole Horowitz, USDOL-OSHA, Investigator, Springfield, MA
     Ms. Migdalia Rivera, Massachusetts Commission Against Discrimination
        MCAD, Investigator, Springfield, MA

**U.S. Department of Labor**

Occupational Safety and Health
Administration
1441 Main Street Room 550
Springfield, MA 01103
(413) 785-0123
(413) 785-0136

**Reply to the attention of:**
Carole Horowitz

August 19, 2002

Behzad A. Samimi
36 Emerald Road
Springfield, MA 01119



Re:    Tyco Healthcare/Samimi/1-1270-02-014

Dear Mr. Samimi:

This is to confirm that we received your complaint of discrimination on August 6, 2002, and docketed it under the above case identifier. Your complaint was filed under Section 11(c) of the Occupational Safety and Health Act of 1970, and was assigned to Investigator Carole Horowitz.

As we explained to you, Section 11(c) discrimination complaints must be filed within thirty days of when the discrimination occurs. You were notified of your termination on February 8, 2002, and did not call the Springfield OSHA office until August 6, 2002 which is a 6 month period. Accordingly, we are dismissing your complaint as untimely filed.

Any appeal of this determination must be filed by letter with:

John Spear, Chief
Office of 11(c)/405 Programs
USDOL-OSHA
200 Constitution Avenue, N. W.
Room N-3468
Washington, D.C. 20210

With a copy to:       K. Frank Gravitt
Regional Administrator
U.S. Department of Labor-OSHA
JFK Federal Bldg., Rm. E340
Boston, MA 02203.

This appeal must be received in Washington, D.C. within 15 days from the receipt of this letter.

Sincerely,                          Investigator:     Carole Horowitz
                                                      USDOL-OSHA
                                                      1441 Main Street
                                                      Springfield, MA 01103
                                                      (413) 785-0123
                                                      (413) 785-0136 (FAX)

Ronald E. Morin
Area Director

**MEMORANDUM**

TO:                    CASE FILE
CASE NAME:             *Samimi v. Tyco/Healthcare/Ludlow/Kendall-LTP*
DOCKET NO:             022302643
EEOC NO:               16CA202866
NUMBER OF EMPLOYEES:   25+
INVESTIGATOR:          Maryann K. Brunton


RE:          **RECOMMENDATION FOR DISMISSAL OF COMPLAINT**
DATE:        **April 30, 2003**


**ISSUE(S) INVESTIGATED:**


On August 6, 2002, Complainant filed a charge alleging that Respondent discriminated against him by subjecting him to unequal terms and conditions of employment and terminating his position of employment because of his national origin (Iranian). Complainant asserted that Respondent's conduct was in violation of M.G.L. Chapter 151B, s4 (1), and Title VII of the Civil Rights Act of 1964, as amended.


**SUMMARY OF FINDINGS:**


Respondent denied the allegations. The evidence presented supports Respondent's claims that Complainant was not treated differently than similarly situated employees outside of his protected class. Respondent states that due to a decrease in the product manufactured by employees supervised by Complainant, his position was eliminated and his duties were combined with another supervisor's duties. The other supervisor was retained because his department was adjacent to Complainant's, he had more direct reports at the time, and he had more seniority than Complainant. Therefore, there is insufficient evidence that Respondent unlawfully discriminated against Complainant.


_____                          _____
Maryann K. Brunton                                 Migdalia Rivera
Compliance Officer                                 Supervisor

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
436 DWIGHT STREET, RM 220, SPRINGFIELD, MASSACHUSETTS 01103
(413 739-2145)

## -DISMISSAL and NOTIFICATION of RIGHTS-

To: Mr. Behzad A. Samimi
36 Emerald Street
Springfield, MA 01109

DATE  5/6/3
Case: Samimi v. Tyco/Healthcare/Ludlow/Kendall
Docket No: 022302643
EEOC No: 16CA202866
Investigator: Maryann K. Brunton

Your complaint is dismissed for the following reasons:

[ ]   The facts you allege fail to state a claim under any of the statutes the Commission enforces.

[ ]   Respondent employs less than the required number of employees.

[ ]   Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ]   The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]   The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[ XX ]   The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ]   Other (briefly state)

### -NOTICE of APPEAL-

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. Your appeal of the dismissal must be made in writing by you or your attorney to the appeals clerk of this Commission (Attention: Migdalia Rivera).

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

Cynthia A. Tucker
Investigating Commissioner

DATE: 5/5/03

cc:   Andrew C. Pickett, Esquire
Jackson, Lewis
1 Beacon Street
Boston, MA 02108

**U.S. Department of Labor**    Occupational Safety and Health Administration
Washington, D.C. 20210

Reply to the attention of:



OCT 22 2002

Mr. Behzad Samimi
36 Emerald Road
Springfield, MA 01119

Dear Mr. Samimi:

This is in response to your appeal of the decision to dismiss your complaint against Tyco Healthcare, filed under Section 11(c) of the Occupational Safety and Health Act of 1970. A complete and comprehensive reconsideration of your complainant has been conducted, including a review of the entire investigative file and related documents.

Based on a review of the investigative file, I have concluded that your complaint was filed untimely. Specifically, an 11(c) complaint must be filed within 30 days of the adverse action. By your own admission, you were terminated on February 8, 2002; you did not file your complaint with OSHA until August 6, 2002, 181 days later. Additionally, the circumstances of your case did not meet OSHA's criteria for tolling the statutory 30-day filing period.

At this time, I must, therefore, inform you that OSHA cannot pursue your appeal any further. I regret I cannot be of further assistance to you.

Sincerely,

Richard E. Fairfax, Director
Directorate of Enforcement Programs

# SEVERANCE PACKAGE SUMMARY

| | | | |
|---|---|---|---|
| Name: | Behzad A. Samimi | SS Number: | 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 |
| Position: | Supervisor | Location: | Chicopee |
| Co. Seniority Date: | 6/19/00 | Supervisor: | J. Thomson |

Last Day of Actual Work: _____ 2/08/02

Date Layoff/Job Elimination Begins: _____ 2/23/02

## SEVERANCE PACKAGE:

| | | | |
|---|---|---|---|
| Number of years worked: | 1 year | Minimum Severance = 8 weeks | $7,567.35* |
| Number of mos. over complete years | 8 months | 8 weeks x  $945.92 = | |
| Length of Service Premium | | | |
| Notice Pay (Regular Pay = 2 weeks) | | 2 weeks x $945.92 =        ○ | $1,891.34 |
| | | | |
| Regular Pay end date: | 2/22/02 | | |
| Severance Pay start date: | 2/25/02 | | |
| Severance Pay end date | 4/19/02 | | |
| | | | |
| | | TOTAL SEVERANCE | $9,459.20 |

## VACATION PAY/:

| | |
|---|---|
| Vacation balance from this year = 3 weeks x  $945.92  = | $2,837.76 |
| TOTAL VACATION | $2,837.76 |

$12,290.96

## Total Severance & Vacation Pay
*Severance pay will be paid bi- weekly until it is finished.*

### *Important Telephone Numbers:*

| | |
|---|---|
| SHPS Health Plan (Cobra) | 1-800-301-7556 |
| Fidelity (401 k) | 1-888-222-8926 |
| Computershare (Stock) | 1-800-621-3777 |
| Cigna Healthcare Member Services | 1-800-694-9398 |
| Prudential (Dental) Group No. 37570 | 1-800-741-4781 |
| Express Scripts RX | 1-800-305-2179 |
| Employee Assistance Program | 1-877-262-1075 |
| Cigna Group Life Insurance | 1-800-828-3485 |

\*  **Eight (8) weeks of severance conditioned upon signed release.**

**HAND DELIVERED**

February 8, 2002

Mr. Behzad A. Samimi
36 Emerald Road
Springfield, MA 01119

Dear Behzad:

As a result of our need to reduce costs in the current economic climate, the decision was made to eliminate your position. This letter is intended to summarize your basic termination benefits and summarize the terms of additional separation benefits that we are willing to offer you during your transition to new employment. Please read this letter agreement, which includes a general release, carefully. If you are willing to agree to its terms, please sign in the space provided below and return it to me within 21 days so that your separation benefits can begin.

1.  Regardless of whether you choose to sign this agreement or not, your employment with Ludlow will end on February 22, 2002, (the "Separation Date"), although your last day at work will be today. You will receive all unused vacation time on or before your separation date. If you choose to sign this letter agreement, your separation may be treated as a resignation, if you so desire, otherwise it will be treated as a position elimination.

2.  If you decide to sign this letter agreement within 21 days, you will receive additional severance pay, in the amount of $7,567.36, which represents an additional eight (8) weeks of pay. This amount will be paid to you in the form of salary continuation at your regular base rate of pay until the additional severance amount is paid in full. Please note that these severance payments will begin within 10 business days after Ludlow receives a signed agreement from you.

    Also if you decide to sign this letter agreement, Ludlow will arrange for three (3) months of career counseling through Drake Beam Morin, a nationally known outplacement firm.

3.  Your group health insurance and dental insurance ends as of February 28, 2002 after which time you may be eligible for group coverage through COBRA for an additional 18 months by paying 102% of the premium cost. You will be contacted directly by SHPs, our third party COBRA administrator, approximately seven (7) days after your termination date. If you choose to sign and return this separation agreement, Ludlow will reimburse you for your COBRA premiums for the first month of COBRA coverage.

    Your participation and eligibility for further benefits under any other employee benefit plan offered by Ludlow will cease as of the Separation Date, unless otherwise provided in the applicable plan documents.

Mr. Behzad A. Samimi
February 8, 2002
Page Two

4.      It is customary practice that a separation agreement should contain a release provision. Therefore, in consideration of the separation payment to be made to you in paragraph two, as well as the promises contained in this letter agreement, you voluntarily and of your own free will agree to release and forever discharge Ludlow, its affiliated companies, officers, directors and employees from any claims you could bring against them arising out of your employment, including, but not limited to those arising under the Massachusetts law against discrimination, G.L. c. 151B, the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., the National Labor Relations Act, 29 U.S.C. §151 et seq., the Fair Labor Standards Act, 29 U.S.C. §201, et seq., the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq., the Civil Rights Act of 1866, 42 U.S.C. §1981 et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701 et seq., the Equal Pay Act of 1963, 29 U.S.C. §206(d), the Civil Rights Act of 1991, the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq., the Massachusetts Wage and Hour Laws, G.L. c. 151, the Massachusetts Civil Rights Act, G.L. c. 93, the Massachusetts privacy statute, G.L. c. 214, § 1B, the Massachusetts Wage Payment Statute, G.L. c. 149, § 148 et seq., the Massachusetts Sexual Harassment Statute, G.L. c. 214 § 1C, the Massachusetts Consumer Protection Act, G.L. c. 93A, the Massachusetts Civil Rights Act, G.L. c. 12, § 11, the Massachusetts Equal Rights Act, G.L. c. 93, any other federal, state, or local human or civil rights, wage-hour, pension or labor law, rule and/or regulation, or public policy, any claim for breach of contract, contract or tort laws, rules and/or regulations, or any claim arising under common law, such as claims for malicious prosecution, defamation, false imprisonment, libel, slander, invasion of privacy, negligence, interference with advantageous relations, infliction of emotional distress, or otherwise,

5.      You understand and agree that you would not receive the additional severance pay and/or benefits specified in this letter, except for your execution of this letter agreement and general release.

6.      You agree that you will not disclose to anyone, either directly or indirectly, any information regarding the substance of this letter agreement and general release. This includes, but is not limited to, any present or former employees of Ludlow and other members of the general public. You further agree that you will not make negative comments about or disparage Ludlow or its officers and employees. A violation of this paragraph will be deemed a serious breach of the Agreement.

7.      Federal law requires that we give you up to 21 days to consider the meaning and effect of this letter agreement and general release, although you may sign the agreement and begin receiving severance payments sooner, if that is your wish. You may also wish to consult with an attorney, and acknowledge that you have had the opportunity to do so. Federal law also gives you the right to revoke this letter agreement and general release for a period of seven (7) days following the day you sign it. If you choose to revoke the agreement, you must submit your revocation, in writing, to me and state "I hereby revoke my acceptance of the letter agreement and general release", together with your signature and the date. The revocation must be personally delivered to me, or mailed to me at Ludlow with a postmark that is within seven days of your execution of the letter agreement and general release. This letter agreement and general release shall not become effective or enforceable until the seven day revocation period has expired.

8.      This letter agreement and general release may not be modified, altered or changed in any way except by the written agreement and consent of both you and me, as the authorized representative of Ludlow.

Mr. Behzad A. Samimi
February 8, 2002
Page Three

9.     By signing this letter, you confirm that you have not filed any claim, charge or action against Ludlow, and that you will not seek any money or damages from Ludlow based upon any claim arising out of your employment at Ludlow.

10.    By signing this letter, you confirm that you have been paid and/or has received all leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which you may be entitled, and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions and/or benefits are due to you, except as provided in this letter agreement and any other correspondence you receive in connection with your separation from employment. You also affirm that you have no known workplace injuries or occupational diseases and that you have been provided and/or have not been denied any leave requested under the Family and Medical Leave Act.

11.    Ludlow agrees that it will provide its standard reference in response to any inquiries from future employers. This reference consists of your positions and dates of employment, and the fact that your position was eliminated and/or that you resigned from Ludlow to pursue career opportunities elsewhere. You agree that you will instruct anyone seeking a reference to direct all reference requests to me. You also agree that you will not apply for or accept future employment at Ludlow.

12.    It is expressly understood and agreed that this letter agreement does not constitute an admission by either you or Ludlow that either party has done anything wrong or acted improperly with respect to your employment at Ludlow.

13.    This letter agreement, which includes a general release, represents the complete agreement between you and Ludlow, except for any post-employment obligations concerning non-disclosure of confidential information, which remain in full force and effect. You acknowledge and agree that you have not relied on any representations, promises or agreement of any kind made to you in connection with your decision to sign this letter agreement and general release, except those stated in this agreement.

On behalf of Ludlow, I wish you every success in your transition to new employment.

Sincerely,

Donna Heffernan-McLear
Human Resources Manager

I, Behzad A. Samimi, hereby acknowledge that I have read this letter agreement and general release, that I have been given a reasonable time to consider its terms, and that I knowingly and voluntarily have agreed to sign this agreement and general release.

Date:_____          By:_____
                                              Behzad A. Samimi

## DISMISSAL AND NOTICE OF RIGHTS

To: Behzad A. Samimi
    36 Emerald Rd.
    Springfield, MA 01109

From: Boston Area Office
    John F. Kennedy Fed Bldg
    Government Ctr, Room 475
    Boston, MA 02203

[ ] *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16C-2002-02866 | Anne R. Giantonio, Intake Supervisor | (617) 565-3189 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

MAR 2 5 2004

Robert L. Sanders
Director

*(Date Mailed)*

Enclosure(s)

cc: TYCO/HEALTHCARE/LUDLOW/KENDALL-LTP
    2 Ludlow Park Dr.
    Chicopee, MA 01022

# BEHZAD A. SAMIMI

36 Emerald Road • Springfield, Massachusetts 01119
Email: samimibdvs@aol.com/ Home: (413) 782-0258

To: Ms. Laura Brelsford           &     To: U.S. Department of Labor
    Massachusetts Commission                 Occupational Safety & Health Administration
    Against Discrimination                   1441 Main Street, Room 550
    439 Dwight Street, Suite 220             Springfield, MA 01103-1493
    Springfield, MA 01103

Date: August 1, 2002                  Date: August 6, 2002

Dear Ms. Brelsford & Ms. Carol Horwitz:

I have been employed by "TYCO Healthcare/ Ludlow/ Kendall-LTP" for approximately 21 months. During the entire time of my employment, starting from my original hiring & interviewing process and thereafter until my final termination, the employer and it's management have shown various blatant forms of discrimination and general workplace hostility toward me. This position termination has been as the result of a series of planned and a combination of many different categories of racially motivated and discriminatory behaviors. Consequently, I have all along been adversely affected, treated unfairly, and discriminated against by one after another sequences as a result of employer misconduct. Underline the office location where I worked in "Hydro-gel/ Promeon Department" is as follows:

**TYCO Healthcare/ Ludlow/ Kendall-LTP,** *(Ludlow Technical Products, LTP)*
**Two Ludlow Park Drive, Chicopee, MA 01022**
**(413) 593-6400**

According to the employer official web-site, "TYCO operates in more than 100 countries and had fiscal 2001 sales in excess of 36 billion dollars. TYCO employs 250,000 people around the world, and runs its operation from Exeter, NH." But, its headquarters are located offshore in "Bermuda". (According to the recent national and local headline news controversy that Tyco's Bermuda headquarters location had been chosen to avoid paying American taxes is an unpatriotic). Underline its headquarter address is as follows:

TYCO International Ltd.
The Zurich Centre, Second Floor
90 Pitts Bay Road, Pembroke, HN 08, Bermuda
(414) 292-8674, (www.tyco.com)

Underline TYCO Regional Main Operation Office address is as follows:
TYCO International (US) Inc.
One Tyco Park, Exeter, NH 03833
(603) 778-9700

Underline Kendall/ TYCO Main Office address is as follows:
Kendall/ TYCO Healthcare
15 Hampshire Street, Mansfield, MA 02048
(508) 261-08000, (www.kendallhq.com)

DISCRIMINATION COMPLAINT
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION AND EEOC

FEPA NO.:                          FILING DATE:
EEOC NO.:                          VIOLATION DATE: 2/8/02

NAME OF AGGRIEVED PERSON OR ORGANIZATION:
Behzad A. Samimi                   TELEPHONE NUMBER (413) 782-0258
36 Emerald Rd.
Springfield, MA 01109

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT
AGENCY OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED
AGAINST ME:
TYCO/Healthcare/Ludlow/Kendall-LTP   TELEPHONE NUMBER (413) 593-6400
2 Ludlow Park Dr.
Chicopee, MA 01022                 NO. OF EMPLOYEES: 25+

**RECEIVED**

**AUG 0 6 2002**

Commission Against
Discrimination
Springfield Office

CAUSE OF DISCRIMINATION BASED ON: National Origin (Iran)

THE PARTICULARS ARE:

Most recently, on February 8, 2002, Kendall/TYCO Healthcare discriminated
against me by terminating my employment based on my national origin (Iran). I was also
subjected to unequal terms and conditions of my employment immediately after being
hired on June 19, 2000, in violation of M.G.L. c.151B s4(1) and Title VII of the 1964
Civil Rights Act.

SEE ATTACHED FOR PARTICULARS

I ALSO WANT THIS CHARGE FILED WITH EEOC:__XX__
I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE
NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING
OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.
I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS
TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

                                   Behzad A. Samimi

SWORN TO AND SUBSCRIBED BEFORE ME THIS ___6th___ DAY OF
_____ 2002

NOTARY PUBLIC    ALAN CASTELLA

My Commission Expires: 2 / 7 /03

# BEHZAD A. SAMIMI

**36 Emerald Road • Springfield, Massachusetts 01119**
**Email: samimibdvs@aol.com/ Home: (413) 782-0258**

To:  Ms. Laura Brelsford
     Massachusetts Commission Against Discrimination
     439 Dwight Street, Suite 220, Springfield, MA 01103

Date:  August 1, 2002

Dear Ms. Brelsford

I have been employed by "TYCO Healthcare/ Ludlow/ Kendall-LTP" for approximately 21 months. During the entire time of my employment, starting from my original hiring & interviewing process and thereafter until my final termination, the employer and it's management have shown various blatant forms of discrimination and general workplace hostility toward me. This position termination has been as the result of a series of planned and a combination of many different categories of racially motivated and discriminatory behaviors. Consequently, I have all along been adversely affected, treated unfairly, and discriminated against by one after another sequences as a result of employer misconduct. <u>The office location where I worked in "Hydro-gel/ Promeon Department" is as follows:</u>

**TYCO Healthcare/ Ludlow/ Kendall-LTP**, *(Ludlow Technical Products, LTP)*
**Two Ludlow Park Drive, Chicopee, MA 01022**
**(413) 593-6400**

According to the employer official web-site, "TYCO operates in more than 100 countries and had fiscal 2001 sales in excess of 36 billion dollars. TYCO employs 250,000 people around the world, and runs its operation from Exeter, NH." But, its headquarters are located offshore in "Bermuda". (According to the recent national and local headline news controversy that Tyco's Bermuda headquarters location had been chosen to avoid paying American taxes is an unpatriotic). <u>Its headquarter address is as follows:</u>

TYCO International Ltd.
The Zurich Centre, Second Floor
90 Pitts Bay Road, Pembroke, HN 08, Bermuda
(414) 292-8674, (www.tyco.com)

<u>TYCO Regional Main Operation Office address is as follows:</u>

TYCO International (US) Inc.
One Tyco Park, Exeter, NH 03833
(603) 778-9700

<u>Kendall/ TYCO Main Office address is as follows:</u>

Kendall/ TYCO Healthcare
15 Hampshire Street, Mansfield, MA 02048
(508) 261-08000, (www.kendallhq.com)

I hereby file this administrative charge of discrimination on the basis of combining the laws, primarily under the 7-laws (Title VII). I would like to protect my rights by proceeding under all the applicable federal and state laws, as well as other isolated laws, the 1871 Act, and OSHA for Discrimination Complaint Filing Regulations (Standards-29 CFR) and exercise any other rights afforded by the OSH Act that might likely apply to my situation. As a former supervisor, I have decided to proceed with filing this case with the office of MCAD fundamentally as a basic nature of a feeling of sympathy toward other current workers and as a desire to ensure their lawful rights at "TYCO". And, to enforce my legal demands on the aspiration towards putting forth the required applicable compliance, and creating a healthier, more protected and ethical working environment. By doing so, I am also hoping that the employer will be forced to end its unlawful discriminatory misconduct after investigation conducted by the MCAD and possibly OSHA/ U.S. Department of Labor/ National Labor Relations Board (although I have not contacted them).

----------------------------------------------

Names of the individuals who directly committed, perpetrated, participated in, had the knowledge of, should have had the knowledge of the series of discriminatory treatments against me, and/or purposely and discriminatorily had chosen to overlook/ ignore the situations, or had misused their authority by not taking the appropriate corrective, preventive, and/or disciplinary actions, are as follow:

Dennis L. Kozlowski (TYCO International Ltd. CEO), Mark Swartz (TYCO International, CFO), Richard Meelia (TYCO Healthcare Headquarter President), Lee Carrier (Resigned President Tyco-LTP), Tom Costella (Director of Entire Plant Operation), Jim Scott (Director of Entire Manufacturing Operation), Jim Shannon (Director of Engineering & Manufacturing Dept. Director), Ralph Delullo (Environmental, Health & Safety Director), Donna Heffernan (Manager of Human Resources), Don Dastoli (Director of Human Resources), Karen Carlson (Director of Quality Control), Debra Fenton (Director of IE &TS), Deb Mikalian (Manager of IE), Roy Peloquin (Manufacturing Dept. Manager), Tony Wozniak (Director of Facility Dept.), Kelly Grandfield (Assistant Manager of Human Resources), Alexis Dow (Health and Safety Manager), Scott Coggins (Research & Development Manager), David Copy (Diversity & Training Coordinator), Nilay Sankalia (Research & Development Director), Gerry Gagne (Director of Maintenance Dept.), Patrick Malia (Quality Control Operation Manager), Jim Thomson (Manager of a Manufacturing Dept.), Luis Longo (Director of a Manufacturing Dept.).

----------------------------------------------

## TYCO-LTP History, Marketplace & its Core Products:

"TYCO Healthcare/ Ludlow/ Kendall-LTP" (formerly Ludlow Corporation) was acquired by TYCO International, Ltd. in 1981. In that year, LTP originally employed approximately 50 persons and currently my place of employment has expanded to between approximately 800-900 employees. In 1994 TYCO acquired Kendall International Co. and merged that operation into "Kendall-LTP". In 1995, TYCO acquired Cambrex-Hydrogels and merged that operation with the "Promeon" manufacturing plant in Chicopee. This combination resulted in a new marketing division called "Procam Medical".

"TYCO Healthcare/ Ludlow/ Kendall-LTP", located in Chicopee, manufactures & markets a broad range of medical products, and as such is in the medical products industry and healthcare marketplace. Its main product were I work represents: recording charts, heart monitoring and diagnostic ECG electrodes/ tabs, heart defibrillation pads/infant monitoring, electro-surgical grounding pads, wound-care dressings, drug delivery patches, and cosmetic facial applications. The core of the product is Hydro-gels, Tabs and electrodes, which as the product ensemble is designed to pick up the heart's electrical signals at the skin's surface. These signals must be intensely and accurately detected. The entire production process control

discipline must continuously meet all the applicable quality standard procedures and are of extreme critical importance. Different applications/procedures require different gel-mix and electrode constructions.

Appropriate gel adhesion levels keep electrodes in place and the patient comfortable. Any factor that might contribute to invalidate, or contaminate the manufacturing process of the product could present a difference between life and death of a patient. As you can see, the sterility and proper functioning of the products manufacturing by TYCO are extremely essential and have large consequences.

------------------------------------------------

In order to adequately show the pattern and the historical background, as well as the employers course of action toward me, it is constitutive to provide you with the relevant disparate treatments from the very beginning of my employment.

Following describes the nature of the circumstantial and series of events. Each course of action that the employer has been taking is linked to previous actions and is racially motivated and wrongful discriminatory misdeeds. The actions were pre-determined and were allowed by the management throughout my employment at "TYCO".

**Element # 1, and evidence supporting the element:**

**(Disparate Racial Treatment in Pre-Employment Job Qualification, Merit and Hiring Process)**

On March 22, 2002, I responded to an ad that the employer locally advertised for the position of "Industrial Engineer/ Safety". The position required any degree in Industrial Engineering and 1-3 years of any related experience. I did not receive any acknowledgement to my letter or to my follow-up phone calls, even though academically I had received a bachelor's degree in engineering and a master's degree in Industrial Technical Management with the specialization of Manufacturing & Operation Research. Additionally, I had 12 years of top producing hands-on experience as an Industrial Hygiene/ Safety specialist.

On April 16, 2000 I noticed another ad that the employer again advertised for a "Manufacturing Supervisor". The position required any associated degree with 3-5 years related experience. This time after I applied for the position, to my surprise, the employer immediately responded to my follow-up letter and phone calls.

Later on, after I became employed by this employer, I noticed that the "Industrial Engineering" position had been filled by an individual with much less education and related work experience than me. *Although I could have always chosen to take an action against discrimination, in good faith I chose to rest my case.*

**Element # 2, and evidence supporting the element:**

**(Disparate Racial Treatment in Hiring Process, Salary Increase, and Verbal Agreements Guarantee)**

On April 26, 2000 I had my first interview with Mr. Jim Shannon as my potential future immediate manager. Pending the hiring process, I went through a course of four interviews and met with different individuals each time. Some time in the beginning month of June, 2000 I received a personal phone call at home by Mr. Jim Shannon with a salary offer of $47,000.00. During the phone call, while I sounded extremely grateful and delighted about the offer as naturally as anyone else would, I very politely attempted to see if the employer would consider to at least meet my previous salary of $50,000.00. But, all of a sudden, Mr. Shannon became extremely annoyed by my very fair request. And right after my inquiry, Mr. Shannon in an

unusual tone of voice informed me that since I am trying to negotiate for this additional $3,000.00, now he does not even feels comfortable to go ahead with hiring me. I then immediately and apologetically attempted to clarify that I did not mean to upset him by any means. Just as I was trying to clear the misunderstanding and justify my negotiation, Mr. Shannon cut me short and continued to say that if he changes his mind as far as proceeding with this interviewing and hiring process he will call me back. It was as if Mr. Shannon had quickly reacted to the above salary negotiation, that he was surprised and caught off-guard that with all my qualifications, I had only asked for only a few thousands more than his offered salary, and that I may even accept that offer. It seemed through his reaction that he was wishing to get me discouraged, or fed up so that I would not want to work under his supervision. Genuinely, for a second, at first that's exactly what came to my mind. To me it was unheard of that a very senior manager at a big company handling a simple fair negotiation that way, especially as an individual who would be possibly my future immediate manager. But, I wanted to be optimistic and to think in good faith, and also to possibly reverse this situation to a possible reconsideration of proceeding with the hiring process.

So, the day after the above salary negotiation, I called Mr. Shannon, Mr. Tom Costella (Mr. Shannon's manager), and Ms. Donna Heffernan (Human Resources Manager) on the telephone. I left a very courteous message on their voicemail thanking them for the opportunity to be interviewed and for their offer, and expressed my continued enthusiasm if I would be given the chance to join the company. And, again the above calls were made by me in good faith and I never mentioned the previous day's conversation that I had had with Mr. Shannon, even though I had thought it to be unprofessional. I also need to mention that I had also sent individualized "thank you" letters for the interview opportunity to all the people involved.

Approximately a few weeks later, I received a call directly from Mr. Shannon. He informed me that the company was still willing to offer me the salary of $ 47,000.00. But when I still attempted to negotiate the salary, he gave me his verbal agreement that at the end of the remaining year (meaning the next 6-months) I would be considered for a raise as if I have worked the entire year. And, that the company would base my salary increase on working one full year. Needless to say, I gladly accepted the offer at $47,000 on the understanding of that verbal agreement.

On June 15, 2000 I again sent individualized thank-you letters to each individual that had participated in my hiring process, including the secretary and receptionist, and expressed my enthusiasm for joining the ranks. My employment began at "Tyco" on June 19, 2000.

Going back to my earlier paragraph, I need to reference a point in regards to the verbal agreement that at the end of the year I would receive a salary increase. Not only did I receive the lowest salary increase in the range of norm (between 3-6%), but also the employer then cut the 3% salary increase to 1.5%. Their reasoning was that I had only worked half of the year. I was also told that I would have to wait another whole year to be considered for another salary increase. I also need to mention that other comparable supervisors that only had high school diplomas were making approximately $3-5 more and hour than me, even though I had a Master's in Manufacturing Management and Engineering degree. When I politely reminded Mr. Shannon in the presence of his assistant manager, Mr. Roy Peloquin, about the verbal agreement that at the end of the remaining year I would be considered as if I have worked the entire year, he responded that he does not quite clearly remember the agreement and that besides, it had not been in writings. Mr. Shannon did not want to hear any more about it and that was that. Later on, in the following week, I attempted to as quietly and diplomatically as possible to bring this issue forward to the Human Resources Department (Donna Heffernan & Kelly Grandfield), but they also did not give me any clear answers.

Basically what they told me was that that type of agreement was not the company's normal procedure and that Mr. Shannon should not have made the agreement.

*It was a no win situation for me and again in good faith I had no choice but to end this controversy, especially with my immediate manager, although I could have chosen to take a discriminatory action.*

**Element # 3, and evidence supporting the element:**

**(Disparate Racial Treatment in Elimination of the Sources of My Work Related/ Occupational Illness)**

On the first day of my employment, upon my arrival at work, it was brought to my attention first by Mr. Shannon and then by many others that a memo about me joining the company had been sent to all employees throughout the company using the e-mailing system, as well as postings on bulletin boards. This memo announced and listed all my occupational health and safety-related certifications and licenses. Also, the memo listed all my advanced academic backgrounds in manufacturing specialization (AS, BS, and MS). What I noticed was that the memo specifically emphasized my 12- years of safety work-related experiences However, I was not hired as a safety specialist but as the "Production Supervisor", which only requires a high school diploma, but preferably someone with a degree, and only requires 3-5 years of any related experience. The memo, however, seemed to portray me to others as a safety specialist. Mr. Shannon, without going through the itemized safety issues, hinted at me that that was why they've decided to choose me among all the applicants, and briefly mentioned that the company appeared to possibly have some safety emissions, especially at the department that I have been hired for.

Surprisingly moments after, upon beginning my employment on the first day of work at 'Tyco", the first thing I noticed was that I was experiencing eye irritation, redness and respiratory problems. At first I presumed that it must be some kind of a flu-like illness. However, as the days went by the symptoms each day had become more severe. I also noticed that the symptoms are clearly very noticeable and it only occurred at work, shortly after walking into the work site, and anytime after 10-45 minutes, and that many other manufacturing operators also experienced similar symptoms. At the end of the work day, many of my colleagues, including other supervisors, would joke around saying to me, "You must be either very high on drugs or completely drunk". Or, "Wow !! Your eyes are extremely bloodshot, are you feeling all right?" I suspected that my symptoms were due to some exposure at work, but wanting to respond very diplomatically and not wanting to create a panic among the workers, I would respond something like, "No, I am all right, it is just an allergy."

On the first month of my employment, I began to spend time, in addition to working as supervisor, to begin doing my own research to detect the source of my and other workers' ill health at work. The first thing that I clearly noticed was that the facilities, especially in the department that I had been assigned as worker supervisor (Gel-Mix dept., 60's & 80's areas), had a very bad chemical dust condition (visible dry chemical powders), especially in the area around the "Chemical Auto-Mix Processing". The facility throughout the company *looked* very modern and superficially clean, with bright new paint and stainless steel machinery throughout the entire plant, but it wasn't. Workers (primarily temporarily employed workers) were routinely· assigned to do the housekeeping every day throughout the day in visible and employee traffic areas. I also noticed that the majority of these temporary workers (90%) were individuals of minority racial category, consisting of African-Americans, Hispanics, and Polish people. Many were non-fluent in the English

language and minimum wage employees. What was amazing to me was that many of these temporarily employees were showing similar symptoms, but much more severe than other permanent employees whose jobs were not related to cleaning the dust. Excessive air-born chemical dust generation in the air, floor and machinery could easily be seen on practically most surfaces in the entire department by the end of the each work shift, especially in the areas that I was mainly assigned for supervision (Hydro-gel Department). The areas not readily visible contained up to 1-inch of chemical dust on surfaces. But, again all the visible and accessible areas appeared seemingly clean, since it had been wiped and swept regularly throughout the entire working hours.

Doing my investigation of sources of my ill health, I noticed that the Chemical Auto-Mix, which was one of the generators of the dust, had not been designed air-close fitting and therefore had been highly subjected to producing air-borne dry chemical powder. This machine had been designed and was built in-house approximately 15-years ago. The only feasible corrective action and best alternative after giving the situation serious thought, in my opinion and after discussing other available options with the management, would have been the complete redesigning of the entire manual chemical mixing process as well as automatic chemical feeding of the process. In spite of that fact, there was a proposal rejection for the redesigning since it would have been considered a major project, very costly and unquestionably required extensive machine downtime, affecting the entire manufacturing production. This department was considered to be the so-called "heart of the company" and was providing the elementary substance to furnish the initial component that is essential throughout the company's different production processes.

At several times during the day, when Auto-Mix was fully functional for a good period of time, you could easily see clouds of many mixed chemical powders floating in the air. Later on near the end of the year 2001, a few months before the unexpected notification of my job termination, I had found out that the roof ventilation systems had not been functional at all for many years. This roof ventilation system had been located on the ceiling approximately 30-feet high. All along I was under the assumption that it had been functional but not very effective. But, to my very surprise, I was told by one of the maintenance personnel that years back they were instructed by the management to asphalt over the roofing exhaust system and to disconnect the roof ventilation electrical panel system. However, they left the production area ceiling ventilation in place as if to make believe that it is operating. So, anyone looking from the ground would assume that this exhaust ventilation must have been functional. I had no idea that it had not been functional at all, and the management never brought it to my attention, and never took corrective actions even though they knew I and many others had been suffering as the result excessive exposure to chemical dust. To my surprise, one of the longtime maintenance personnel told me that this was done as a result of the management's request, primarily in order to save in the loss of heating and air-conditioning.

Continuing my investigation of sources of my ill health, I noticed excessive existent of molds and mildews on mezzanine beneath the sodium-amps tanks, around the underside of the 60's-Line machines, inside the pit-grading trench (for over spill collection of gel/chemicals liquid), laboratory hoods around the sink and walls near the calibration testing equipment, floors, and all associated wood cabinets. This especially is not acceptable when the employer is manufacturing and marketing a wide range of very high sensitive medical and healthcare products. Upon my findings I immediately notified my immediate managers, but since no action was taken, I contacted Patrick Malia (Manager of Quality Control & Internal Inspection & Audits). He told me he will look into this safety issue. Months passed by and no action was taken. I then contacted Tony Wozniak (Director of Facility Dept.) by going for a walkthrough inspection, and showed him the locations of mold and mildews. Again months passed by and no action was taken. I then contacted Gerry Gagne (Director of Maintenance Department). Same thing once more, months passed by and no action was taken.

Finally, after 1-full year that had passed from my repeated requests of corrective actions, management decided to replace all the rotten wood cabinets with stainless steel cabinets and counters. Additionally, many of the laboratory hoods chemical mix ventilation in that department had not been fully functional for years. Again, after going through the same chain of commands and repeated requests by me, the laboratory hoods ventilation systems were inspected and corrected.

Moreover, another area in that department (the chemical room storage and manual chemical mixing room) has no means of ventilation system at all. Also, this manual chemical mixing room had two ways of entry/exit with no doors, accessible to any one at any time. On many different occasions in this chemical storage and mix room we had experienced toxic chemical spills. In addition, this chemical storage and mix-room many times had been flooded with up to 6-inches of water. This flooding occurred as the result of occasional over-floats of the adjacent gel-pit. The gel-pit chemical waste material which had to be pumped out would malfunction regularly and would be leading into the city sewage discharge system. I brought up this hazardous operation practice many times to the management's attention and recommended corrective actions. But, they would either ignore my comments entirely, or choose a temporarily solution. They would much rather concentrating on projects that would be assisting them to speed up the production, and would intentionally overlook many unsafe practices. Essentially, they did not want to get involved with corrective actions of any safety issue projects that would take away from the company's profits. This repeated over-floating from the gel-pit was also caused mostly from a combination of the deficiency in the original pit design not being able to handle heavy density chemical gel-ingredients and improper waste disposal practices.

Although I personally and periodically at the beginning and at the end of my shift would check for the solidified build-up of chemicals, but still we would encounter this problem regularly. The entire disposal and mixing processes had been given a serious redesigning consideration. Other contributing factors to the safety problems were that there were insufficient wall paneling for the electricity and improper amp capabilities, as well as constant loss of the trip valve, causing a routine power lost and/or tripping in check valves capability. Additionally, other departments (especially Charts Dept.) would dump their chemical waste disposal right into their sinks and then it would lead right into this pit that is located at 60's Areas. Therefore, obviously with all these chemical waste dumping the safety check valve would fail pumping the gel-pit properly. Besides, the chemical gel-mix holding tanks from the very first day of operation had not been designed appropriately because they did not have a shut off electronic sensor device. This at least would prevent the continuous accidental gel tanks overflowing directly into floor drains beneath the 60's-Line machine and ultimately leading straight into the pit.

The gel-mix tanks overflowing and bad design and other chemical disposal and mixing operation would leak into the adjacent chemical room storage, causing potential imminent reactivity, toxicity, and possible explosivity reactions. Additionally, this room had no fiber drum protection safeguard stands to raise the drums up above the floor, in order to minimize, and/or contain the chemical spills and for decontamination procedures. Every time a chemical spill happened, operators were instructed by all previous management to just push the contaminated chemicals right into the adjacent room floor drain pit. Every time I attempted to change this improper practice by bringing this up to the attention of other management including the Director of the Safety Department, it seemed as if I was slowing down production. I was repeatedly ignored and told that I was making this out of proportion, and to just concentrate on production supervisory leadership.

BEHZAD A. SAMIMI

Going back to the subject of workers and my work related illnesses, it was obvious that all this unsafe work practice and many other still to be identified by a professional had been adding to the very poor indoor air quality and making the air circulation/ filtration condition considerably worse. Knowing many of these documented tragic incidents I brought the above safety issues to the attention of other supervisors and my manager (Mr. Shannon). Very defensively changing the subject, Mr. Shannon told me to just concentrate on the production and worker's supervisory responsibilities. I told him that I was concerned about the potential health and safety of my workers. I also told him about my own personal exposure, and all the symptoms that other workers and I had been experiencing. He told me he had noticed that my symptoms had greatly increased at work, and surprisingly told me, "Your eyes looks even worse as I have began talking to you". In fact, I practically stood up and showed him the lack of HVAC ventilation (as well as lack of supply and return system) in his office and throughout many other offices. He cut me short and told me he will look into the issues. But, he then continued to say that my symptoms were probably just an over reaction caused by an allergy to some other thing.

In those same above mentioned areas, the same excessive combination of several combustible chemical powders in the department accumulated static charge, and had resulted in a massive explosion tragedy when a worker attempted to use his non explosive/ non grounded vacuum for housekeeping purposes. This caused the employee to severely burn 75% of his entire body, including greatly suffering a permanent disfiguration of his face, neck, shoulders and his entire both arms extending to his shoulders. In other instances, other department workers have had back injury. One person's entire arm went through a press machine causing permanent injury disfiguration. Almost every one of these accidental injuries was as a direct result of unsafe work environments created by the management's neglect in not identifying potential hazards. And, mostly, by management, in an attempt to speed up the production, deliberately not enforcing safety standards, and overlooking safety procedures and intentionally allowing workers to practice in unsafe work conditions and unsafely operating their machinery.

On another incident, in a different department, I personally witnessed a young worker lose three of his fingers completely right from the base of his hand in a machine which, according to OSHA standards was supposed to be protected by a machine safeguard. A few other personnel and I attempted persistently to see if we could locate the missing fingers inside the machine for possible reattachment, but after a few hours were unsuccessful since it was completely crushed to no finding at all.

A day after the above tragic incident, during a business safety transaction, I was yelled at by Mr. Scott Fearnley (a Manufacturing Supervisor from another Dept.) that why was I always try to act like a "champion" in either at this recent worker accident or other similar situations. He also told me that the worker lost his fingers because of his own stupidity and he does not even feel bad about him. I was astonished by this insensitive observation, and shook my head in disgust to his inappropriate remark and walked away. I just happened to be in the area approximately 20 feet away from this heartbreaking accident. What did he expect me to do, just to walk away, just like nothing happened? And not even try to at least assist him in finding his fingers for possible reattachment? After this particular disagreement with me, he stopped talking to me entirely. Mr. Fearnley had also talked with others about his opinion in relation to the worker's accident and repeatedly over his general feelings against me. Although somehow the entire company knew about this insensitive behavior from Mr. Fearnley, a Manufacturing Supervisor, neither the management nor Human Resources ever attempted to bring this unacceptable unsympathetic conduct to his attention. They all failed to take suitable actions even after I had gone to his immediate manager and spoken about his unacceptable behavior.

At another time, when I was trying to suggest and show step by step and functionally to Mr. Shannon how and where the Auto-Mix machine needs ergonomic redesigning, his voice all of a sudden sounded extremely rude to me and while yelling at me told me to get away from him. Then he continued to say that "when you are talking to me you come too close to me". It was loud enough that my other coworkers from a far distance noticed his rude reaction and later showed me sorrowful concern. We were at least three feet away from each other. I was talking quietly, but I was not too close to him. All I wanted to accomplish was to confidentially and discretely speak with my manger, and to prevent other workers from hearing the content of our conversation or to know the nature of our conversation.

Weeks passed by and management took no corrective measures in response to my repeated concerns. Finally, in the month of August, 2000 I decided it was necessary to bring this issue of unsafe practices to the attention of Human Resources Manager Donna Heffernan. Surprisingly supporting my findings, she told me other personnel have also been experiencing similar symptoms, and that she would look into this matter.

I believe she had contacted the Health and Safety Director Ralph Delullo, since Ralph contacted me a few days after and requested for a walkthrough of the job site with me. The first thing Ralph indicated to me, was that he was not pleased that this matter had been raised with the manager of the Human Resource Department. I told him that since weeks had gone by and all other management had taken no actions including himself from the Safety Department, I thought that I would be taking the best alternative by going to H.R. I had done so only by good faith in mind. And, then we preceded with the inspection.

During the walkthrough I practically showed him all the unsafe issues that in my opinion had potentially contributed to work related health issues and suggested possible corrective actions. However, he, the same as others, informed me that I was overreacting about the safety issues, that the company had been practicing in this manner for years and there had been no major concerns before. He saw no adverse health affects arising from the possible auto/ manual chemical mixing process dust generation, or the HVAC air circulation & filtration system. Then he jokingly told me we are not an asbestos or lead paint removal industry, and that I had been making this way out of proportion due to the nature of my past environmental safety work experience. And, again, same as all others he told me he would look into my concerns although he was quite convinced that my symptoms were probably just an overreaction caused by an allergy to some other thing at work. He then jokingly told me that maybe the redness of my eyes was telling me to look for another job.

I relied on reporting violations of general safety standards first to the management, HR, and safety departments within the company rather than going to outside authorities. I wanted to give a reasonable period of time to remedy the violation, but based on disparate racial treatment against me they completely and deliberately ignored my well justified findings, and instead either not responded or criticized me for it.

Needless to say that the only corrective action taken was just to inform operators to do a better housekeeping work, which basically meant sweeping and mopping the floors more often. As of the date of my job termination dated 2/8/02, no permanent corrective actions, prevention or elimination of the sources of safety issues had been implemented. And, I have no knowledge if any safety measurements have been implemented after my job termination.

I had suggested many times before to the safety department that we should conduct a legitimate exposure assessment industrial hygiene air quality monitoring. True and authentic factual air monitoring should be conducted in 8-hours Time Weighted Average (TWA), and when the actual chemical mixing is in full process, using a Personal Monitoring Assessment and certainly it should be conducted in the worker

"breathing zone areas". This exposure assessment monitoring also should be aimed to identify Permissible Exposure Level (PEL), and Threshold Limit Value (TLV). Also, air monitoring sampling for all average, single evaluation of "Short Term/ Long Term/ 30-Minutes Assessment", "Worse Case Scenario", "Highest/ Lowest Peak Operation", especially when the auto or manual mixing is in full function, should be taken. Additionally, for comparing to a standard, these should be taken at times when the chemical Auto-Mix is not functional, in off-shift hours, and during initial, middle, and end of the day shutdown/week-end shut down conditionings. It is very imperative that all working and non-working conditions be taken under consideration to calculate the legitimate and justifiable value of worker exposure assessments. But certainly, it is not proper to intentionally take samples at the times of no disturbance only, or at places far away from the known potential exposure locations or in pre-determined designated areas.

I also had been informed by some employees that various past industrial hygiene air monitoring was conducted only at times of non-normal working and mixing conditions. Also these testings had been done when the chemical mixing operators and supervisors have been informed and instructed in advance either indirectly or prepensely. At those times, the operators have been told to take extra precautions and to be very attentive not to disturb any chemical mixing operations or to generate dust conditions.

Many of these chemical powders by themselves, and while in contact with other chemicals or when air-borne, as can occur with a spill, have been recognized as a potential danger by Material Safety Data Sheet (MSDS) standards. I also need to mention that I was told by a former recent employee that all manufacturing supervisors have been instructed not to speak to me and under no circumstances to forward my calls to anyone employed at the company. So, again I need to re-emphasis that since I no longer am employed there, I have no knowledge of whether any corrective actions or preventive safety measurements have been taken.

*And again, it was a no win situation, especially after repeatedly conveying my concerns about the various safety issues to many management. And, again I had no other choice but to continue to suffer from severe allergic reactions which were activated by exposure to the hazardous chemicals at my work. Although I could have always chosen to take a discriminatory treatment actions, pertaining to the fact that my employer intentionally didn't eliminate the sources of my work related illness. But again, I wanted to act in good faith and very diplomatically without causing a panic among other workers do my job and to continue to do my best to identify and to at least minimize the potential health and safety issues and to continue bringing them up to the attention of the management. I also wanted to give reasonable time to my employer to correct their series of unsafe work practices before leaving no other choice but to contact a public and have them to enforce their authority.*

<u>**Element # 4**</u>, and evidence supporting the element:

<u>**(Disparate Racial Treatment in Preventing me from Processing the Work Related Injury)**</u>

Starting the month of September 2000 my symptoms had become more extremely severe, and I had been seen by a few separate doctors on different occasions, while paying for the expenses myself. I had been told by my physicians allergy specialist that through a series of extensive chemical skin patch reaction testing it is apparent that my symptoms had been exclusively activated by exposure to chemicals at my employer work site.

*(Before I continue I need to bring the following page to your attention).*

*Following is just a summary of my medical doctor visits as the direct result of all the above work-related illnesses. This does not include the medical consultation over the phone with the doctors or nurses.*

- *My medical treatments started from 9/01/00.*
- *My medical treatments ended 4/1/02.*
- *Allergy shots began on 10/26/00 (total of 2- shots, one per each arm).*
- *Total of 52 different times I had to go and visit the hospital just for allergy shot injections. This had to be done in order to very gradually build up my resistance and immune system against chemical exposures at work.*
- *During my employment I had been under the care of 4 specialists (total of 10 separate-visits).*

On October 19, 2000 I decided to fill out an Incident Investigation Report in order to begin the process for workers compensation investigation. This was done only in good faith and in order to only to get reimbursement for my out-of-pocket medical expenses. I specifically told Mr. Ralph Delullo, the director of Environmental Health and Safety department, the above report and my intention of only getting reimbursed Ralph again became very annoyed by this subject of work related/ occupational injury. He told me that he still believed that my injury was not work related and that I was just suffering from a common allergy. He told me he would wait on to the report and would get back to me later.

A few days after, he came in person to speak to me confidentially. To my great surprise he told me that he had talked with other managers, including Mr. Tom Costella (Director of Entire Plant Operation) about this and in his personal opinion he felt it was not advisable for me to file for workers compensation coverage. This time he was much more understanding, and then continued to say that being employed as a Manufacturing Supervisor of workers, I am considered middle management. And, that filing might somehow jeopardize my future potential and the possibility of obtaining a higher position and job advancement. He also added that as a Safety Officer he knows that all department management get a copy of the Safety Statistic Report and the specific nature of injuries. And, that the nature of my injury falls under reportable cases. He continued that all management and supervisors automatically receive all the names of all individuals that have filed a reportable case. He also said I could consider him as a concerned confidant and colleague who wanted my best interests. However, if I would like to precede with filing the report, that it would be entirely my decision. Shockingly, I didn't know what to respond to him at that moment . So, I told him to please hold on to the report, not to process it, and to let me think about it over and I would get back with him later.

As I was thinking about whether or not to file for worker compensation coverage, I was struggling with the meaning of what Ralph had told me both bluntly and indirectly. I became skeptical: Is my not filing finally likely to be my passport to a nondiscriminatory relationship of management toward me? Or, is filing most likely to even more exasperate their discriminatory conducts toward me, and most likely to be the final painful stamp on my exit visa? I had to think about it profoundly.  If I chose to file, they would probably eventually find a safe, legal way to escort me out of the company.

(Before continuing my autographing incidents, I would like to remind you that I am filing this case with MCAD because of the racially discriminatory termination of my employment at TYCO.  Among all the employees I have been the only individual in the history of this continually growing company that has been considered a laid-off employee.  Since the employer has been continually growing, even in situations of possible job elimination, the employees has always been given advanced notice and an opportunity to other

job transfers. But in my case, the employer, due to racially motivated actions, had chosen a disparate discriminatory treatment approach to make an exception).

Continuing and going back to my previous train of thought, after my talk with Ralph, I easily recalled my recent extreme financial difficulties after being laid off in another firm with comparable but different circumstances. Just before my hiring by TYCO, it took me almost 1-full year to obtain another employment. Then I thought about my 2 small children, and two disabled parents, and a salary that I could barely survive on. I wanted to act in good faith and to give the employer additional equitable chances to straight their various non-compliance safety issues.

But, more than anything else I was worried about the future well being of my workers and their worker rights being taken away from them. And, that most likely the employer would eventually terminate my employment. Moreover, who would then be courageous enough or willing to stand up for the workers to protect their health, safety and other legal rights. I knew that presumably, correcting the safety issues and eliminating discrimination at the company would not come from authority figures at the top, or the Human Resources department, or some supervisors. Many have been victimized and been taught and advocated indirectly by the top management to be concerned mainly about one thing, meaning greed and the "Concept of the Bottom Line", numbers and dollars. The corporate culture has indirectly but clearly spelled out to the employees that it is all about "quota". With that mentality and process comprehension, management always encourages and rewards employees with generous bonuses to continue their discriminatory conducts to achieve that objective. Through their racially discriminatory concepts, the employer always has behaved substantially more critical and negatively toward minorities that happen to recognize their unethical corporate/individual greediness and desire to suggest constructively a more productive and safe action plans. On contrary and disparately if other non-minority personnel would desire to suggest the very identical issues, the employer would gladly welcome the ideas and would positively and repeatedly even reward the employees for the guidance.

In my case, I was not only considered an individual born and raised in Iran (which sometimes causes stereotyped thinking), but also they discriminatorily considered me as a threat to themselves. Management knew well of my job advancement potential, my advanced academic manufacturing background, and my past professional employment experiences. They also disliked that I had been having an excellent reputation among workers as an effective problem solver and a superb motivational production supervisor who effectively fostered a cooperative working environment. They considered me a threat specially as an Iranian born manufacturing supervisor who had one of the highest academic backgrounds in manufacturing than any other supervisors, as well as many of the top management. They had to somehow find a way to continue creating a hostile working environment for me so either to eliminate my position, or cause me to resign and look for employment elsewhere.

It has been known throughout the company that there were two other individuals with similar safety and ethical ideas as mine. In fact, these two individual also happened to work at the same department (hydro-gel) as mine, and they were also both from a foreign country (Greece). They were Nick Gargalidis (Production Supervisor), and Peter Kousoulis (Dept. Manufacturing Manager). They were well liked by many manufacturing workers. These two individuals also chose to jeopardize their career advancements to get up and do the right thing, and to constructively criticize unethical misconduct. These two individuals, also as a result of employer planned intentions lost their jobs, and were forced to accept a generous severance package and to sign a release waver categorizing them as voluntarily resigned individuals. In fact since there was much talk among other workers about this discriminatory employer movement toward them that the

management had decided to hire me, a member of a similar racial category minority to divert and reverse the discrimination comments that had been spreading throughout the company. Some workers even commented that it was amazing that I even looked like them.

I always attempted to disagree with the workers' above comments, and always endeavored to foster a cooperative atmosphere. My main intentions were especially to unite the management and workers closer to each other, to increase the workers moral and values toward the company, and ultimately lead to a more productive working atmosphere. Many times, without going through the details of the comments I had heard, I suggested to the management and Human Resources department about the significance and the need to conduct diversity training seminars and training throughout the company. What I wanted to convey to the management was that we needed to have a much more corporate ethical reform. Many very good and productive workers would come to my office and many almost in tears. I was penalized many times and repeatedly by means of creating a hostile working condition, false evaluation reports, job advancement limitation, reduced benefits and privileges, depriving work related illness investigation, termination, and lack of medical reimbursement related coverage.

Many times management warned me not to get involved in worker and labor relations and not to try to change the corporate mentality that has already been established (meaning pro-profitability of the corporation rather than pro-workers). Instead all management/ supervisors were forced to go through mandatory extensive training classes called "how to preserve a union free manufacturing environment".

By no means have I ever during my entire work history background at any time wanted to advocate a unionized workplace. In fact I had never have worked in a union work environment anyhow. All I wanted to do was to very diplomatically assist the employer toward a more ethical behavior.
What the bottom line is, is that the most important element, unfortunately, in some corporations is to do what is in their own best interest. I also knew some of the management were under extreme pressure and indirectly had been encouraged to continue and speed up production, no matter what it took, to achieve some of the corporation's and individuals' greedy goals. I have to admit this had been one of the most difficult decisions of my life. I made the difficult decision against my best judgement by agreeing to NOT file the Work Related Injury Report, and consequently had to continue to pay work related medial expenses out of my pocket. I came to the final conclusion that I would be of much more support to my coworkers and my family if I remained employed.

But, I kept my personal belief that at the same time I would maintain the objective and ultimate goal of worker protection, and attempt to identify, evaluate and suggest different ways of safety and ethical practices as best as I could; to reduce, and foremost eliminate potential health and safety emissions that would ultimately be translated into increased worker moral and in conclusion higher corporate productivity. This was to be accomplished in my mind while striving to be a very fair and firm supervisor first with exemplary virtues within myself. I knew this would be a very complex task since I was not a part of management (Manufacturing/ Production Supervisor).

I was optimistic and was willing to put up with some things as long as I could contribute to my coworkers as best as I could. I didn't want my corrective actions to be classified as a so called disgruntled "whistle-blower" individual without giving the employer a reasonable and fair second chance for a change. More than anything else I wanted very much to act in good faith and very diplomatically and while endeavoring to increase the worker productivity and cooperation in the approach of more ethical course of undertakings. I

knew it would have to be possibly a progressive change in individual unethical misconduct when one is dealing with an unethical corporate culture mentality. But, I was ready for that challenge.

*And again, as I am repeating myself, it was a no win situation for me to dispute with the employer and face race related retaliation and risk losing my job and the opportunity to continue supporting my coworkers. And, over and again I felt I had no other choice but to continue suffering from severe allergic reactions which were activated by exposure to the hazardous chemicals at my work. Although I could always chosen to take discriminatory actions or to contact a public-body to have them enforce their authority.*

## (Disparate Racial Retaliation of Job Elimination for Reporting Unsafe Work Practice in Writings)

On the month of September 2001, the newly designed "80-Line Machine" began start-up testing operations by going through a series of experiment production proceedings. This newly invented machine had the product line conception of an admixture of many other internal machines with the distinction of introducing a brand new product line. This was being done through non-stop advocating of mainly major transformations of expanded modernization methods, production acceleration, and enhanced modification engineering techniques. The Engineering Department, Research & Development and Technical Service were directly involved from the original concept to final assembly and final review innovation process.

Associated components with the line are consists of various combustible powders which are being operated in conversion of the product. The substance is reported as admixture of finely ground combustible chemical powders in a different particle size range. This new 80-Line machine had already at the primarily stage associated costly expenditure expenses. Although it had a moderately good potential of future accomplishment, but in reference with "Exposure Control Assessment" had many air-born chemical dust generation deficiencies. Since the entire machine theory and assembly parts were originated internally, the mechanism conformity innovation, classification and all associated pertinent industry regulations of the product output should had been very carefully authorized and certified during the final "trial/ experimentation" Product approval/ compliance intervals. But, unfortunately the employer under its management operation had main desire as to always only concentrate on speeding up the engineering design assembly to finalize its production process planning in order to acquire higher profitability margin as quickly as possible. In midway course of this engineering processing they had again once more neglected many operative dust generation safety issues. The primarily safety emission over and again had been surrounding the same negligence pattern of ignoring worker potential chemical exposure and its associated inherent hazards.

The 80's-Line consisted of open chemical powder drums, hoppers and holding tanks that had not been designed sealed tight. During the machine operation the operators had to manually vacuum from this open drums into the hoppers. But, you could easily see clouds of chemical dust leaking from the holding tanks, open drums and dust leaky hoppers. Many times due to the deficiency of original design in withstanding the pressure, all of a sudden there would be a massive physical outburst (explosion like) of the machine. As the result of this ongoing outburst all the associated seals as well as all the joint gaskets and fittings seal would burst, causing diffusion and distribution of chemical dust all over the work area. The most distressing of these incidents, in addition to being detrimental to the air quality, was that these incidents would happen while other surrounding machinery were fully operational making highly sensitive diagnostic medical products. This room did not have an exhaust ventilation system, which would cause the air-born chemical dust to float in the work site for a long period of time throughout the day.

I could not believe or understand the rational behind the employer's lack of sensitivity for continuing their unsafe work practices. Not only had they not eliminated the source of our (mostly minorities) continuous illnesses, but also they were adding much more each day to the sources of many illnesses. The location of this new 80-Line machine also happened to be chosen in the same room known as the heart of the company, where many safety deficiencies had been brought to the attention of management. Without correcting or investigating the known reports of unsafe working conditions they had decided to create an entirely new unsafe work condition. Moreover, now this new machine, when in operation, added to the chemical dust generation of adjacent machines (60's-Line, Auto-Mix, and Gel-Mix/ Chemical Rooms) that had been making the indoor air quality even substantially more worse.

Finally, after repeated intercommunications with management face-to-face and via phone calls about this safety issue including the Research & Department Dept., Facility Engineering Dept., and Safety Dept., I got the final authorization to go ahead and to again contact the Director of Maintenance (Gerry Gagne) for the exposure control assessment improvement. But, this time on December 13, 2001, I decided to also request this improvement work via email, addressing all appropriate management for their immediate corrective actions. I also included with my findings step-by-step suggestions for improvements. The next day Ralph Delullo came in person to me and informed me that he was not very pleased that I had requested for this exposure control assessment for air quality improvement in writing and in such detail. He specifically was not pleased with me that I had mentioned that the roof exhaust ventilation had not been functional for a very long time. Well, again, although the work was approved from the management, they took no actions. When I again and again re-demanded safety improvements they bluntly told me they will get to it when they can. However, a few months had passed and no corrective action had been taken.

In another circumstance in regards to the new 80's-Line machine, another safety issue originated. The previously mentioned combustible chemical powders by a new recommendation had to be made into smaller particle sizes into  micron range. In order to accomplish this size range, management had decided to have workers use their hands through a manual straining process which pressed through a known micron filtration procedure and into an open drum without any respiratory face masks. This was creating clouds of chemical powder all over the atmosphere, and much worse directly into the workers lungs. Immediately as soon as I saw this, I questioned Lenny Harris, the previous shift supervisor, about the unsafe work practice. He told me these procedures had been authorized by the management, and it was not such a big deal. His shift workers had been doing that all day, and it was very important for the company to have the workers continue this powder staining process, since by the next shift they would need 2-3 more full drums of this powder. Well, indeed, it was a big safety issue to me. If I was forced to continue this process, I would take my own worker safety precautions as best as I could. I had the drum fully covered and sealed with a clear plastic and created two small openings that would cover the whole filtration on the drums for workers hands to go through them. I also had the workers fully equipped with coverall suiting, safety goggles, gloves, and a half face respiratory protection and to take all the safety precautions to minimize the dust generation. I would actually stand there and watch them doing the operation, making sure that they follow all appropriate safety precautions. But, I still was very unhappy with this primitive manual chemical straining processing. This process should have been automated and performed in a closed and well-ventilated area. I also had noticed and been told that other workers outside of my shift were allowed to continue the straining chemical powder as before (meaning unsafe work practice and without any supervision). Management bluntly would not emphasize to the workers to take all appropriate safety precautions during the operation. They would actually tell the workers that these chemical powders are positively known harmless. The only respiratory protections that were given to them were paper-like facemasks which provided very little protection. Many uninstructed workers had chosen to not use a face mask at all.

BEHZAD A. SAMIMI

The previous page unsafe work practice was very discriminatory, since this time not only they have intentionally and discriminatorily ignored to eliminate the source of my illnesses, but also the employer approved by management were knowingly targeting exposure to dangerous chemicals mainly to certain group category of minority individuals. Some individuals voiced their refusal to work under those conditions. To the temporary minimum wage workers, management bluntly gave them a choice of either doing their work assignments or no longer be working there. To me, this was the last unethical work practice arising from series of racial discriminatory actions. I had no choice but to stand up more firm and start documenting these series of employer discrimination actions in writing.

I had become aware that the employer needed a major corporate ethical reform. Corporation corruption also sometimes goes beyond the corporation's bad accounting practices. What's much worse is that there are also corporation discriminatory unethical conducts, such as intentionally ignoring safety issues of certain racial ethnic groups and others, and jeopardizing the lives and health of innocent workers for the achievement of higher corporation profits and mainly for the boss's higher stock market return. By no means do I have an anti-business mentality and philosophy. I believe businesses are where my jobs, my wife's jobs, and my children's future jobs will be. But, I have a problem when CEO's and top managers are discriminatorily making pro-business personal profit decisions rather than making conscientious pro-worker health and safety resolutions. On January 17, 2002 I decided to request the correction of this latest unsafe work practice also in writing with all appropriate management. The next day I noticed an enormous shift of alienation and withdrawal from the management as well as other supervisors towards me. It was as if I didn't even exist. They were minimizing their interactions with me as best as they could. Many of my normal business questions were responded by just a plain yes or no answer. I knew that now the employer knew well that I had decided to start reporting all unsafe work practices in writing the requests to the management. And, that they were not happy at all about this behavioral change in my latest corrective action plan. They were worried and nervous that I now meant what I suggested. They did not want to take that chance, and had to get rid of me once and for all. This had to be done so they could continue their discriminatory actions on others and to assist the corporation CEO's greed for personal benefit. When you are dealing with unethical corporation mentality you can't have them "police themselves". There is very limited legislation that protects or encourages people that want to end or minimize discriminatory and unethical employer misconduct. There are very limited employment protections for individuals that want to act in good faith, to have their voice heard, to stand up and protect the public, consumers and workers. I knew in advance that the problem with many big corporations is that they, or their high priced attorneys, know the laws very well. They know exactly how far, and how, and when to push the law to get away with so many unethical and discriminatory misconduct and still be safe to continue their unethical behavior.

On February 7, 2002 right before I was about to go home, Mr. Jim Thomson asked me if I could come early to work the next day. On February 8, 2002 shortly after I arrived early to work, Mr. Thomson walked me to the Human Resource Department and then walked away from the Office. All of a sudden I found myself in a closed room with the Jim Scott (Director of Entire Manufacturing Operation), and Donna Heffernan (Manager of Human Resources). I knew very well what is going to happen next and management's final step. They handed me the "Job Elimination Notification". But, we all knew very well it was "Employer Retaliation" of my ongoing inquiries and especially my latest inquiries for reporting the unsafe work practices and encouraging corrective actions. Management acted by intentionally eliminating my job. Again, this job elimination was executed without any prior notice of their decision and without granting me a chance to apply for past, current or future job openings. They escorted me out of the office that day and asked me not to return.

In summary, I feel TYCO has discriminated against me and others as minorities. They have continued to create unsafe work environments, especially if those suffering are of minority backgrounds. I feel my position was unjustly terminated, as a result of the truths I had in good faith uncovered and the just conditions I asked for myself and my coworkers. It is not the individual incidents that are important. It is all about pattern. Pattern speaks for itself, and at my former workplace the disparate pattern was one of management intentionally & discriminatorily ignoring my concerns, and planning and executing their racially biased and motivated actions by showing repeated racial opposition toward me.

There are numerous other discrimination actions in many different discriminatory variation have occurred, but I have chosen to leave these out and only concentrate on those that directly affect health safety. If you are interested and it would be helpful, I would be more than fortunate to submit those details to your office.

Very Respectfully,

Behzad A. Samimi

Enclosures:

- Copies of Employee Evaluation (3)
- Copy of Response to Employee Evaluation
- Copy of Employee Personal Evaluation
- Resume, Safety Related Project Highlights
- Former Employer (ATC) Recommendation Letter
- Employment accomplishments

# BEHZAD A. SAMIMI

36 Emerald Road • Springfield, Massachusetts 01119
Email: samimibdvs@aol.com/ Home: (413) 782-0258

Date:     September 4, 2002

To:   John Spear, Chief
      Office of 11(c)/405 Program
      USDOL-OSHA
      200 Constitution Avenue, N.W.
      Room N-3468
      Washington, D.C. 20210

Re:   Tyco Healthcare/ Samimi/ 1-1270-02-014

Dear Mr. Spear:

Very respectfully yours, I am writing this appeal notice letter to your
attention as the result of having been notified of the finding of OSHA
investigation. Accordingly, attached you can find a copy of the
Springfield, MA OSHA office investigation that they are dismissing my
complaint as untimely filed (not filed within OSHA 30-days filing
limit).

I would like to acknowledge that, I truly understand and respect the
OSHA office of Springfield, MA decisions, of  based on the fact that I
had only submitted them with only detail nature of my complaint
allegation, and not attempting my justification of filing delay. With my
full apology, please notice that at the time of my complaint letter that
I filed with the office of Massachusetts commission Against
Discrimination (MCAD) on August 1, 2002, and the Springfield, MA OSHA
office on August 6, 2002, I had not known that I had required to provide
OSHA office with any additional detail explanation of my justification
for tolling beyond OSHA 30-day time filings. For that reason, I am
convinced that with my misinterpretation of discrimination filing time
and my misunderstanding of the jurisdiction differences  between OSHA &
MCAD by all means the OSHA Springfield, MA office were justified to
conclude and file my complaint letter as untimely filed at that time of
submittal.

However, now that I have been more informed after much more thoughtfully
reading and each applicable regulation individually. I now hereby, very
respectfully am requesting a thorough investigation appeal review under

my complaint section 11(c) of the Occupational Safety and Health Act of 1970. I am also through this letter would like to make all necessary motions for reversing this 30-days untimely ruling in my case in which I feel has been unclear to me.

I was mislead as stating that "An employee alleging retaliation by an employer for the employee's assertion of rights guaranteed by OSH Act must await a determination by OSHA that there is a meritorious case. However, <u>there is no time limit on OSHA investigation of discrimination complaint</u>". At that stage of my mental and physical distressful conditions after my job loss, I had mistakenly have translated that, no time limit means, no time limit with any OSHA discriminatory cases. In which, now I see how I could have been misunderstood. I was also in the assumption that 30-days limitation applies with any cases other than OSHA retaliatory discriminatory cases. Likewise, I was in the presumption that both MCAD & OSHA will be working as a team in an OSHA retaliatory discrimination cases. In which, the 6-months time limitation would have been applied.  I believe this 30-days filing ruling in general is very unfair, even to a normal healthy and capable employees.

In many situations there are many workers that are not aware that exercising their rights under the OSH Act is sometimes what has encouraged the personnel action retaliation and misconduct. On many occasions, They will not know that until much later time after this time limitation. What I am trying to show is that  there are many indications of a weak whistleblower protection law especially in OSHA with this time limit. I believe that in all OSHA cases, especially discrimination filing time should be <u>at least</u> the same as MCAD discrimination filing limitation. Other improvement in law that is needed such as no time limit in OSHA investigation discrimination process. What this means is that due to the shortages OSHA investigators, it can take any amount of time of investigation. A combination of not enough OSHA inspectors and not enough funding can means employers know getting inspected by OSHA is not only very uncommon, but the violation cited is by far much less than actually doing it safe, particularly if it cost the employer to fix the safety problem. In here who generally speaking suffers the most is not only all the workers, but mostly minorities. The more uneducated, the more non fluent in English, the better chances for the company not to get cut with violations. Since the chances are that unfortunately uninformed workers would not most likely identify the hidden health and safety problems, or to speak up for their rights. As the result again minorities or low paid workers suffer the most. Since most temp employees and low paid employees are minorities. I realize with the very limited OSHA annual budget, all the investigators and all other OSHA staff's are doing their best as they could possibly can do. I admire them for their hard work. But, many times this no time limitation in OSHA investigation discrimination process it would takes years and years with the numbers of available investigators. At many occasions without any findings and solution. Nonetheless, the worker has lost his job and most likely is to get continually retaliated again and again by the same

employer. That same employer knows well the laws and how to legally push the law and still be safe. They have very expensive attorneys working on their best interest. But, what workers have, with time limitation hardly any. Also, now the employer knows how to retaliate, how to give a bad references, or just refraining to say anything to a potential employer. The other employer will read the rest of the story. Obviously workers subconsciously fearing all these factual evidence would rather become blind folded. I just can't comprehend, the employer confused me too about these gray area laws too. It is amazing now that I have read the associated safety rulings much more carefully now everything is just a simple plain English language. These issues just must have confused me back then after the job loss, as I am sure so many other workers as well. Especially when are experiencing so much sufferings after the job loss. These are the gray and shady areas that definitely a major improvement is needed.

Although in my specific situation all the above would have made no difference in my particular situational of depression and anxiety post dealings after my job loss. Since, even if I would have known of that 30-days limit, under no circumstances would I have been able to file an effective, orderly and timely filing, and not way until my filing with MCAD dated of 8/1/02 anyway. Other compelling reason in my case for justifying me tolling time limit are as follow that I know:

- In regards with my case and the continuance retaliatory conducts, I believe that the employer (TYCO-LTP) is presently and continuing their violation of discriminatory to me and many others minorities still employed.
- I also believe that the employer has concealed, and misled, regarding the grounds for my discharge and other adverse actions.
- The employer failed to inform his workers of the 30-day time frame, to post a notification, where workers could easily see, at all the bulletin boards.
- A major purpose of the 30-days period is to allow the secretary to decline, to entertain only the complaints which have become stale (please see the above 3-paragraphs).

Please notice that technically my last date of employment termination was on February 8, 2002. As you are familiar OSHA requires that the discrimination complaints should be filed with the OSHA Area Director within 30 days after such Violation occurs. However, the Massachusetts commission Against Discrimination (MCAD) requires discrimination complaints to be filed within 6-month after such violation occurs. My case is extremely unique, in which in its entirely interconnects with both agencies.

Dear Mr. Spear, before I justify my reasoning to a waiver on this OSHA ruling to the honorary member of the appeal board it is extremely imperative that your office thoroughly read my entire 17-pages of complaint detailed letter which had been addressed to both OSHA and

MCAD. I am very sympathetic and sorry to your office that both this letter and my previous letter is very long, and that your office have to go through the trouble of reading them very carefully. But, it is very imperative that then and only after then that you can consider for yourself that the safety issues in my joint filings are in its entirely substantiated and factual indication to both cases of my MCAD filing and OSHA filing. After reading this long 17-pages of each elements and evidence supporting the elements you would be able to characterize its relevancy of contents are the pressing issues of the case. I believe to go forward with this case effectively, it should be considered areas of interconnection and question of secondary, as well as its cross-referencing, determination and its investigating process. For a very brief summary of understanding, my last page of that 17-pages of detail complaint letter summarizes as:

"In summary, I feel TYCO has discriminated against me and others as minorities. They have continued to create unsafe work environments, especially if those suffering are of minority backgrounds. I feel my position was unjustly terminated, as a result of the truths I had in good faith uncovered and the just conditions I asked for myself and my coworkers. It is not the individual incidents that are important. It is all about pattern. Pattern speaks for itself, and at my former workplace the disparate pattern was one of management intentionally & discriminatorily ignoring my concerns, and planning and executing their racially biased and motivated actions by showing repeated racial opposition toward me.            There are numerous other discrimination actions in many different discriminatory variation have occurred, but I have chosen to leave these out and only concentrate on those that directly affect health and safety. "

Although the names of filing agencies in my unique case are different, but, its reasoning are fully applicable.
As you can see from the date of my MCAD filing (August 1, 2002) I had also had extreme difficulty to meet the dead line for them. It was not until the August 6, 2002 that I was notified by MCAD (Ms. Laura Brelsford) that MCAD has no jurisdiction over OSHA investigation, and that I need to file with OSHA personally. I then, immediately added and addressed OSHA to that same letter. And, on the same day hand delivered a copy of my Joint filing of MCAD discrimination and OSHA discrimination with the Springfield., MA OSHA office. In addition to the above circumstantial indications, once again I would like to stress that even if I would have known of this unfair OSHA 30-day filing limitation it would have been absolutely impossible for me to be able to file effectively and orderly to a minimum acceptable filing standard. I was not able beyond my control, again not until the same date of my filing with MCAD on August 1, 2002.

-    Please accept the followings as just a summary of some of my personal justification I had selected among many other personal difficulties that I deem could share comfortably with you.

Followings are only some of the explanations that I had chosen to bring to your attention. In which, it had prevented me by circumstances of various physical and mental conditions beyond my control for appealing within the time-limit with OSHA. Factors such as feeling of hopelessness and worthlessness after repeated job terminations, generalized extreme anxiety and depression disorder, traumatic stress disorder, panic attacks and phobias. Other compelling factors such as lack of medical insurance for me and my family, going through separation and divorce after my job retaliatory termination, not being able and prevented from freely visiting my children, going through visitation rights & custody court battles, paranoid that wife is planning to remove our children to her country (other than mine) and not returning, my brother going through the job loss, bankruptcy and nervous breakdown,, disabling parents going through the adverse effect major anxiety and depression requiring constant care, other hostile concerns caused by environmental factors, biological factors, psychological factors, socioeconomic factors, genetic cultural expectation & adaptation, compounded with a sudden drastic increase sequences of on going racial & ethnic disparities, racism, racial profiling, and racial hate crimes toward me and my property.

In addition to experiencing a major anxiety, worry and depression was encountering multitudinous adverse visible symptoms at the same time, as well as associated medications side effects. My magnitude of symptoms at time included but not limited to; difficulty thinking, concentration, making decisions, feeling paranoid, feeling disappointment, experiencing nightmares, frustration, fear, lack of energy, lack of fulfillment, at times thought of harming self, start smoking for the first time leading up to a pack a day, eating irregularity, neglecting self not keeping a lively life, restlessness, feeling on edge, sleep disturbance, irritability, being easily fatigued, extreme muscle tension including trembling, twitching, feeling shaky, and back aches, neck, shoulder and legs soreness.

On many occasions I had called MCAD and had spoken to Ms. Laura Brelsford from MCAD office and had explained in details of my physical and mental conditions and that I have been going through many different variances conflicting issues. I also had expressed my concerns particularly worried about that I may not be able meet the deadline of the 6-months MCAD filing limitation. In which, as you can see for yourself I also had barely met the deadline with the office MCAD, 6-months time limitation.

Followings situations are only additional substantiated and factual examples that I had selected to bring up to your attention. These situational circumstances had prevented me by means of various physical and mental conditions beyond my control for filing within the time-limit with OSHA. These predicament had continued all the way to the 6-months filing deadline with MCAD:

- In order to adequately show and proof the pattern and the historical background, as well as the employer's discriminatory safety courses of actions toward me and other minorities it was constitutive in my original letter for me to provide MCAD, and, or & OSHA office with the relevant employer disparate treatment from the very beginning of my employment (going back to approximately 21-months of my memory recollections, while experiencing many of the above symptoms simultaneously).

- In my particular case, I could not just write a draft opinion. The draft required extensive writing and research, while taking into account that English not being my native language. I, as a primary writer had to invest extensive time to refresh my memory blunted by the passage of time, while suffering from a major depression, anxiety and a somatic conditions. And, that I was unable to deal adequately with my legal issues, my children separation from me, other family members anxiety transformation affected by my stressful situations, and foremost going through my own divorce legal procedures shortly after my job retaliatory termination, resulting going through so many financial difficulty affairs after. In many times I had to find myself changing language in a draft without conscious thought, that procedural improvement needed, just writing a simple sentence seemed a big chore for me and sometimes impossible to complete (please see attached related documents).

- Other compounded happening incidents such as vandalism/ hit and run to my car while my car was parked in parking lot and no one in the car. Other incidents such as rock and tomato throwing to my property which all documented by the local police stations and ACLU. Getting routinely racially profiled, followed by the same officer in different occasions/ location, unfairly being cited for the traffic violation that did not commit while having an excellent driving record and actually was getting safety credit points for being an excellent driver (please see attached related documents).

- My wife of another country than mine (from Thailand) which is now realizing the facts that she has married to an Iranian man that is continuously twice in a row his job has been retaliatory terminated as the result of discrimination. She knows that his previous job elimination lasted him being unemployed for approximately one full year and she easily can recall the past and all the financial difficulties her family had gone through as the result. And, now only god knows how much longer this time her husbands unemployment status will last. Furthermore, knowing her husband's compassion for humankind, workers health & safety, civil rights and social justice, even if he gets a job after another year of unemployment, how much longer will it take again for him to loss his next job over. She has to think about the wellbeing, financial security of herself and foremost her two small children's. Obviously she sees

no clear future for her family with this man, which repeatedly being victimized and subjected of repeated retaliation of a job loss, and racial hate crimes. She is also a full time college student, learning English language, and mother of two small children, under those conditions can not be employed at this time. Not having a health insurance makes it extremely difficult for her family. She is from a country that has not fully experienced a retaliatory racial discrimination. And now after her husbands job loss, and thereafter, all she knows most likely her marriage with this man is going to be consisting of a continuous troublesome and a repeated wrongdoing against him along with a constant feeling worrisome of a future uncertainty of not having a normal life. She is now also same as her husband feeling hopeless. And, in a way she is frustrated that he always has to feel obligated and concerned about wellbeing of others and has many times jeopardized his job by doing the right things. Why can't he compromise his standards sometimes and do what is the best for his family? In fact now she is starting to blame him for losing his job. Why can't he be like many others, some even don't have the experience nor does the credentials that he has, but they are a lot more financially successful, and their family much more happier as the result. She also is aware that especially after the September 11 horrifying tragedy the backlashes against peoples of her husband's national origin (Middle Eastern decent) is getting worse and at its highest.

To be honest in respect to what my wife has been feeling, I have also been feeling distressed and sorrowful for my wife and my two small children now. That, they also have to suffer and deal with all these predicaments. It is amazing, I have never been thinking that way. What if my wife when start working after her college graduation, or what if my two small children grow up and to get victimized the same way as me and subjected to work discrimination against them solely because they are related to an Iranian which naturally brings stereotype thinking from others. Although, I realize all these facts, but, it is wonderful that I still do not regret that in good faith I required my employer to correct their misconduct, and hopefully my colleagues will probably get the health and safety they deserve. Many of my workers, colleagues including the wrongdoers management they were like family to me. For god sake you get attached to them. Many days I had been seeing them at work much more than I have been seeing my wife or my children. I feel that I knew so especially much about my workers, their family, their unhappy mood and what how can makes them joyful. Especially my workers many times, I knew exactly how to motivate them, in order to increase productivity, lowering the waste, and increasing efficiencies. In just less than two years working there, I felt that I had known them all my life. I enjoyed talking with them, seeing them smile. It was like they were my children, and that I was worried about their health and safety. I don't know why management had to retaliate against me and terminate my job, when I

was equally worried about their health and safety as well, not just and
my workers only. I wanted to foster a healthy atmosphere company
not a source of their ill health. Now, I am starting to get frustrated
and disappointed again, why top management had to do what they had
been doing others, specifically and intentionally targeting
particularly minorities than others. Don't they care about
humankind. It is not fair I just meant well,… why? Why?… I have
been feeling so many things, and in so many direction.
Occasionally, I try to give credit to myself, that at least I know
in future when my children grow up I can look into their eyes and
have no guilty conscious. And, that in future I still feel good
about myself that I have not compromised my standards just for the
sake of my own personal benefit. But, at present time, after my
unexpected job retaliatory job loss, I know I had been feeling
extremely hurt, and depressed of series of injustice, and
unfairness at my workplace when all I intended to do, to do the
right thing.…. was

- On the month of February, I had been told by a family member that
my wife is planning after filling for divorce to leave this country
and return to her country of Thailand with our two small children
and not to return. Naturally, always loving my wife very much and
our children this was extremely difficult for me. What if she would
actually would do that. She had already moved out of our home to
her sisters house and been living there. Without confronting her of
what I have heard I had become extremely nervous and paranoid. I
started to become overly beyond reason to spend a good quality of
time with them at their sisters house. But, I was feeling
uncomfortable there, and she wouldn't allow me to take them out
freely. I wanted to do anything possibly I could have done to show
them my love and devotion for my family and wanting so much for
them to return back home. leaving in from her sister house to me

- By the end the month of February my wife informed me that she has be...
seen a divorce attorney. This was a shock to me. I knew after my  income
job loss she had been talking about it, but I now, I am getting
even more and more paranoid. On the month of June she informed me
that she has planning in a week to leave the country to Thailand
with our two children and to return after two months. I became
much more paranoid that I almost had a nervous break down. The next
day morning I went to the court without my wife's knowledge and
asked for an emergency family court hearing. I explained to the
nature of my situation and that there is a possibility that my wife
would leave the country and not to return with our two children.
The next day the judge had the sheriff serve my wife with a summon
informing her that she is prohibited from leaving the Commonwealth
of Massachusetts without permission of the court. When my wife
received this notice, she had become extremely angry with me doing
Such th. that. She continued to prevent me to see my two children freely,
but now I am not even welcome to go see at her sisters house
, but
                                            Now at...
                                        our children at

(please see attached related documents).

- On the month of July, my wife served me with a divorce court order.
  This was another shock for me. Again loving my wife very much,
  being frightened of losing her, and being paranoid not seeing my
  children ever again. Although I had a court order for her being
  prohibited from leaving the state , but as far as jurisdiction of
  the court there was nothing to prevent her from actually doing/leaving
  that. Doing so, would have made her under the court contempt. But,
  if she is not coming back again in this country again, there is not
  much that court could do. Since her country is considered a third
  world country with a very limited and restricted international
  treaty it would have been extremely difficult for me if not
  impossible to ever see my two children ever again. Although she had
  told me that she has all the intention to return from her country,
  but, from what I had heard saying on contrary I could not just take
  that chance. She had filed for a divorce with me and all I wanted
  to believe what if she would actually would do that. Near the end
  of the month of July she informed me that her grandfather has just
  passed away and now she really has to leave. It was a no win
  situation for me, on July 29th we went to the court and I against
  my will gave the court my permission for my wife to leave the
  country with our two small children for approximately one full
  month. (I need to let you know that she had returned on August 30,
  200 with our two children). At least on this issue I am now feeling
  much as ease. But, until they came back and since the month of
  February my life has been nothing but a series of continuous
  uninterrupted emotional nightmare beyond my control (please see
  attached related documents).

- Just before appearing to the court for a divorce/ separate summon
  and while attempting to meet the dead line of 6-months time
  limitations of MCAD on July 28, 2002 caused me to have a complete
  nervous breakdown requiring me to be taken by the ambulance to the
  hospital emergency room under intensive care treatment (please see
  attached related documents).

- The situation was becoming worse knowing as of February 28th we
  would have no family health insurance. At one time, when
  accidentally I had injured my finger, and since I could not afford
  the continuation of the employer  very expensive so call "Cobra
  Insurance" caused me to neglect visiting a doctor for antibiotic
  treatment which caused a severe painful hand infection, requiring
  me having to use a clinic  emergency room for treatment. (please
  see attached related documents).

- Additionally, due to a major anxiety disorder I was also suffering
  from a severe muscle tension, resulting to a sever back, and both
  leg pains. It was making it very difficult for me to walk, to stand
  up, and to sit down at times (please see attached related

documents).

- I had been prescribed to use various maximum dosage of anti-anxiety and anti-depression medication in order to be able to cope with the stressful situations. Using the medication alone had taken so energy away from me that I was not being able just to do many normal life activities, not along writing a 17-page memory recollection. Each time that I attempted to pick up a pen to write causing me the flash back of painful employment foregoing and the substructure in increased anxiety and heightened depression. No matter what dosage of medication I was prescribed by my doctor, still the symptoms would persist. The problem was that no medication was, or is able to eliminate or to reduce the circumstances of the series of misfortunate events that was continually happening to me all at the same time (please see attached related documents).

- In the process that I was going through all these depressive mental and physical  conditions beyond my control, my other family members were also similarly and emotionally situated like mine. My brother also had recently before my job loss had his job. Similarly his wife also had decided to end her marriage with him. And, now and I can't even be supportive to him. He had to leave his house and to move in with me. His situation was so bad that just like mine not only he lost his job and marriage, but also going through a long period of time of emotional disorderliness causing him a complete severe nervous breakdown. Now, not only I was having rough time myself I had to share his emotional distress compounded with mine. His situations was combined with having had to go through his bankruptcy procedures and expressive of emotional backlashes . Loving my brother dearly I wanted so much to be his support at these difficult time of his life. But, the problem was that I was also going through the same thing and as well as very much near bankruptcy myself. It had been very painful for me not being able to help him financially, not having to go through his bankruptcy. In our country cultural belief going through bankruptcy is considered one of the most difficult circumstances in life.  Family members are almost always are obligated to help each other in this painful proceeding in order to prevent this from happening. At the same time my parents seeing their two dear son major mental and physical conditions causing them experiencing their own dealings of major anxiety and depression to get much worse. At times, I would come home unexpectedly and see them into tears. Although, they tried so hard to hide their feelings, but we knew very well what they had been feeling. Just looking at them was enough to see everything inside. Additionally, our parents general disability and mental and physical conditions were intensifying by all these depressing series of events. Now, at that time, I had been feeling much more guilty seeing them this way, they needed support. All these responsibilities was too much for me to handle while at the

same time I had to do extensive job hunting and getting prepared with interviews, and meeting potential job placement contacts and networking (please see attached related documents).

- I needed support through my psychiatrist doctor I was referred to a community care mental health crisis center. They facilitated and I participate to an eight-week of anxiety and depression management support group learning the approaches and relaxation techniques in order to help me manage and reduce my major anxiety and depression disorders. This class had been very effective to me by the end of the completion of this training (please see attached related documents).

- Other distressing situational circumstances added with racial & ethnic disparities, racism, racial profiling, and racial hate crimes toward me, and my property. Including a vandalism/ hit and run to my car while my car was parked in parking lot while no one in my car two weeks before the job termination. This vandalism to my car caused a major damage to my car not fully paid by the insurance company. All the aggregations that had to go with the insurance company. Not being able to drive the car weeks after my job termination since I could not afford making the car driveable. Other incidents such as rocks, tomatoes throwing to my house, my car, and damage to my front yards property in the months of March, April and May which all documented by the local police stations. In addition I was getting racially profiled, followed by, and pulled over racially harassed by one of the same police officer in different occasions while having an excellent driving record and actually getting safety credit points for being a good driver. Although after a very long frustrating repeated phone calls to the office American Civil Liberties Union of Massachusetts (ACLU), two months after, on August 23rd I was notified that they decline to help me with a list of the reasons of their findings. Going through the series of happenings I was extremely frustrated and compounded to my adjunct anxiety and depression (please see attached documents).

Just writing this appeal letter has been extremely difficult for me, depriving me away from many commodity of family matters, legal issues, financial dealings, continuous current marital difficulties, child visitation and care, job search & upgrading skills, many other hardship that not feeling comfortable to share with you, and in general a major deprivation of a quality of normal life in that matters.

If it wasn't because of all the below listed active and ongoing continuous treatments and medication application., as well as that extensive 8-weeks anxiety/ depression support group, I would have never been able to meet the deadline for MCAD, and or now this OSHA appeal letter in that manner. Now, I had learned many of learning cognitive behavioral approaches and relaxation techniques to manage my anxiety and depression over time. This intensive support group training was completed on August 7, 2002. However, I am still not ready to go detached on my own, and still required actively under a complete care being treated by Doctor John D. Ferris, Therapist Donald Levy, and Psychologist Ph.D. Laurie H. Weinberg and continuing regularly my anxiety and depression medication. Many professionals have assisted me with my slow recovery process.

Following are the combined professional team working efforts in an on-going actively involved direct treatment process to me,  professionals such as:

-    Psychiatrist doctor in which was referred by the employer (Tyco) "Employee Assistance Program", M.D. George Kriebel, at Valley Medical Group, treatment for the duration of one month.
-    Psychotherapist M.S.W., L.I.C.S.W. John A. Laneve, in which was referred by the employer (Tyco) "Employee Assistance Program", a Private Practitioner, treatment for the duration of one month.
-    Therapist Mr. Donald Levy, DD/MH, M.A. at "Mount Tom Mental Heath Center"
-    Psychiatrist M.D. John D. Ferris at "Mount Tom Crisis Mental Heath Center"
-    Licensed Psychologist Ms. Laurie H. Weinberg, Ph.D., "a Private Practitioner"
-    Therapist Ms. Jennifer Moore, MSW, "Mason Square Community Mental Center (b.h.n.), Pathway Program, Anxiety/ Depression Support Group Facilitator, and Therapist
-    Therapist, Cerise Washington, Mason Square Community Care Mental Center (b.h.n.), Pathway Program, Anxiety/ Depression Support Group Co-Facilitator, and Therapist
      Other professional staff in which participated in my consultation therapy sessions in which had greatly assisted me and were actively involved with me on my treatment were also such as:

-    Ms. Silvia Wilson, Orientation Case Manager, Community Care Center, Behavioral Health Pathway
-    Ms. Zaismely Anderson, Community Care Center Case Manager, Behavioral Health Pathway
-    Ms. Ana Martinez, Mason Square Bay State Medical Center, Counselor, Access services

Many thanks to all the above professionals and many others public

community care and admirable exploits for their continuous support. They are truly the community hero's, my hero's and my family's hero's.

In conclusion, through my recent dealings with suffering a major anxiety and depression disorder for the first time in my life after my retaliatory and discriminatory job loss, I would like to share with you some of my findings about my own experience. At the end of the completion of my latest 8-weeks anxiety and depression support group training class, I had shared with the group some of the common feelings of an individual of this type of disturbance thoughts beyond personal control. The depressed, and anxious disorder individual could be resembled with a person that is in love, hence at the same time very contrasted and a very disturbing feeling.

" Depression and anxiety disorder is like love. It is a state of mind that overwhelms and distorts the senses. The whole world looks and feels different. But, whereas love seems to imbue all the molecules of the earth with a heavenly, light energy, the depression and anxiety increases the weight of the world until finally it is too dense and dark to stand up in. Worse, the self loses its value in such an atmosphere. The depressed and anxious disorder person is but one more grain of sand washed up on an endless, meaningless beach. Like men & women in love the depressed and anxious disorder person can think of or feel beyond that experience".

I believe most appellant being a non lawyers are at great disadvantage, because they are unfamiliar with legal research and legal writing techniques. Thus, all too often the theoretical right to appeal is frustrated by the reality of our complicated legal system. As I'm sure that you are also agree to the fact that appallee as correspondents, does not consider that each appeal is just another complaint to be handled, and tackle it in a routine way. The mission of improving appellate in not be achieved effectively. As you have experienced many times appellants show the law makers where the laws are weak in our society or a public service. It is seldom that an appeal is wholly unjustified. There is usually some ground for the appeal writing. Most appeals are legitimate reasoning in which appallee welcome with open arms. They open the way for an investigation, since if no one appealed, the handling and fairness of law will be diminished. After all, they are a barometer because you they point out our week spots. I am sure that as I know you as appallee are always glad that appeallents write to you. Because you know it will give the law makers a chance to make thing right.

The emphasis is that You and only You the honoring board of appeal can make law on an appeal. As I am sure again many times you have experienced That it is great feeling to know that you have had a major effect on the laws of our society, regardless of how insignificant to civilization the issue may be at times.

It has been an honor for me, having had the opportunity writing this appeal letter. Would like to express my grateful appreciation for going through another long letter of mine and as I am sure many others letters each day. I applaud you and your staff for the tremendous work you have accomplished, and still have ahead of you. I would be more than glad to furnish you with additional information or documentation if you would like to.

I look forward to your final appeal review response.

Very truly yours,

Behzad A. Samimi

℃JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Behzad A. Samimi

**(b)** County of Residence of First Listed Plaintiff  Hampden, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
"Pro-Se" 36 Emerald Rd.
Springfield, MA 01119

## DEFENDANTS

Tyco Healthcare/Ludlow (Ludlow technical Products)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

*Please ad
See attached*

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Employment Retaliation

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 2/22/05

SIGNATURE OF ATTORNEY OF RECORD
Behzad Samimi "Pro-Se"

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

3058106

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) *Sannini / Versus  Tyco*

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

____ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

____ II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       for patent, trademark or copyright cases

____ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,       *( please see
           380, 385, 450, 891.                                                attached )*

____ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

____ V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐    NO ☐

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐    NO ☐

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐    NO ☐

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☐    NO ☐

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☐    Central Division ☐    Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐    NO ☐

(PLEASE TYPE OR PRINT)    *"Pro - se "*

ATTORNEY'S NAME    *Behzad A. Sannini*

ADDRESS    *36 Emerald Rd. Springfield, MA 01119*

TELEPHONE NO.    *413-782-0258 - Home*

*413-237-5295 - cell*

Coversheetlocal.wpd - 10/17/02)

## BEHZAD A. SAMIMI

### 36 Emerald Road • Springfield, Massachusetts 01119

### Email: samimibdvs@aol.com

### Home: (413) 782-0258/ Cell: (413) 237-5295

---

Date:       February 22, 2005

To:         United States District Court,

            Office of the Clerk

            United States Courthouse

            1550 Main Street, Springfield, MA 01103

Re:         Behzad A. Samimi (<u>Pro-Se Plaintiff</u>)/ Verses

            TYCO Healthcare/ Ludlow/,
            Ludlow Technical Product, Chicopee, MA (Defendants)

## <u>Civil Cover Sheet Attachment</u>

## <u>Category that best describes this case, "Nature of Suit":</u>

Please note that listed below is the Nature of Suit and associated code violations. I as a "Pro-Se" not being an attorney have investigated below codes and to my best of knowledge this law suit is arising under a combination of the following, but not limited to:

1

- The Sarbanes-Oxley Act of 2002

- The Massachusetts Consumer Protection Act, G.l.c. 93A

- The OSHA- Act of 1970, 11 (C), Public Law 91-596

- The Violation of Clean Air Act & Clean Water Act

- The Violation of M.G.L. Chapter 151B, s4 (1)

- The Title VII of the Civil Right Act of 1964

- The Civil Right Act,  Public Policy

- The Civil Rights Statue, 42 USC Section 1981 and 1983

- The Civil Rights Act of 1991

- The Civil Rights Act of 1964, 42 U.S.C.& 2000e et seg

- The Massachusetts Civil Right Act, GLc. 93

- The Massachusetts Civil Right Act, G.L.c. 12 & 11

- The Massachusetts Equal Rights Act, G.L.c. 93

- The National Labor Relations Act, 29 U.S.C. & 151et seg

- Massachusetts Law Against Discrimination G.L.c. 151B

- The Fair Labor Standards Act, 29n U.S.C. &201, et seg

- The Employee Retirement Income Security Act of 1974,29 U.S.C. &
  1001 et seg

- The Equal Pay Act of 1963, 29 U.S.C. % 205(d)

2

**BEHZAD A. SAMIMI**                                                        **Page-3**

- The Massachusetts Wage and Hour Laws, G.L. c. 151

- The Massachusetts Privacy Statue, G.L. c. 214, &1B

- The Massachusetts Wage payment Statue, G.L. c. 149, & 148 et seg

- The EPA, POTW, Prohibited Discharge 40 CFR 303.5

- The  NESHAPS, AHERA & Pollution Prevention Act of 1990

- The TRI and EPCRA Act and of 1986

- The RCRA, TSCA, CERCLA, OSHA and HAZCOM, 29 CFR
  1910.120

- Any other federal, state, or local human or civil rights, wage-hour,
  pension or labor law, rule and/or regulation, or public policy, any
  claim under arising under common law for malicious prosecution,
  defamation, libel, slander, invasion of Privacy, negligence,
  interference with advantageous relations, infliction of emotional
  distress, or otherwise.

*Behzad Samimi*

Behzad  A.  Samimi

3

# Plaintiff's Address:

**Behzad A. Samimi**
**36 Emerald Road,**
**Springfield, MA 01119**
**E-Mail: samimibdvs@aol.com**

# Defendant's Address:

**YCO Healthcare/ Ludlow/ Kendall-LTP,** *(Ludlow Technical Products, LTP)*
**Two Ludlow Park Drive, Chicopee, MA 01022**
**(413) 593-6400**

According to the employer official web-site, "TYCO operates in more than 100 countries and had fiscal 2001 sales in excess of 36 billion dollars. TYCO employs 250,000 people around the world, and runs its operation from Exeter, NH." But, its headquarters are located offshore in "Bermuda". (According to the national and local headline news controversy that Tyco's Bermuda headquarters location had been chosen to avoid paying American taxes is an unpatriotic). Its headquarter address is as follows:

TYCO International Ltd.
The Zurich Centre, Second Floor
90 Pitts Bay Road, Pembroke, HN 08, Bermuda
(414) 292-8674, (www.tyco.com)

TYCO Regional Main Operation Office address is as follows:
TYCO International (US) Inc.
One Tyco Park, Exeter, NH 03833
(603) 778-9700

Kendall/ TYCO Main Office address is as follows:
Kendall/ TYCO Healthcare
15 Hampshire Street, Mansfield, MA 02048
(508) 261-08000, (www.kendallhq.com)